IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) RAMON RAMOS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 22-cv-00061-CVE-JFJ |
| ) | |
| (1) SCHLUMBERGER GROUP WELFARE ) | |
| BENEFITS PLAN, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Ramon Ramos, for his cause of action against Defendant Schlumberger Group Welfare Benefits Plan, alleges and states as follows:

### I.   Jurisdiction and Venue

1. Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover benefits due under an employee benefit plan, and to recover costs and attorney's fees as provided by ERISA.

2. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Under 29 U.S.C. § 1132(f), this Court has jurisdiction without regard to the amount in controversy or the citizenship of the parties.

3. Venue is properly in this district pursuant to 29 U.S.C. § 1132(e)(2) because the breach took place in this district, and pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

### II.   Parties and Plan

4. Plaintiff is a fifty-seven (57) year-old man. He resides in Tulsa, Oklahoma and within this judicial district.

5. Plaintiff worked as an Environmental Solutions Specialist for Schlumberger

Technology Corporation ("Schlumberger").

6. Schlumberger sponsors the Schlumberger Group Welfare Benefits Plan (the "Plan"). The Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(7) Section 3(1) of ERISA.

7. The Administrative Committee is the Plan Administrator and is the "named fiduciary" with respect to the general administration of the Plan.

8. Schlumberger offers a variety of benefit programs under the Plan, including short term disability ("STD") benefits and long term disability ("LTD") benefits (hereafter "Disability Program").

9. At all relevant times, Plaintiff was eligible to participate in the Disability Program and Plan, did participate in the Disability Program and Plan, and was a participant in the Disability Program and Plan within the meaning of 29 U.S.C. § 1002(7).

10. The STD and LTD benefits provided for pursuant to the Disability Program are self-funded by Schlumberger.

11. Cigna Group Insurance ("Cigna") is the Claim Administrator with respect to claims for STD and LTD benefits pursuant to an Administrative Services Only ("ASO") agreement between Schlumberger and Cigna.

12. Under the Disability Program and the Plan, the maximum duration for STD benefits is twenty-six (26) weeks.

13. Under the Disability Program and the Plan, the amount of weekly STD benefits an employee may receive over the course of the 26-week period varies pursuant to the employee's job. The general rule is that STD pays 100% of the employee's base pay. However, the STD benefit for certain "field direct" positions is increased to 130% of base pay because such

employee's base pay is significantly less than their actual monthly pay.

    14.    With respect to whether a claimant will or won't receive STD benefits pursuant to the Disability Program and Plan, the applicable Plan document states:

> You will become eligible for STD benefits if Cigna determines that you've missed work for more than five consecutive work days due to a Disability.
>
> * * *
>
> To remain eligible for STD benefits, you must periodically provide proof to Cigna that you continue to be Disabled.

    15.    The applicable Plan document further advises "When Cigna determines you're eligible for STD benefits, your benefits will begin and will be paid retroactive to the first day you were Disabled. Your STD benefits will end on the first date that one of the following events occurs:

> - you're no longer Disabled;
> - you fail to provide satisfactory proof of your continuing Disability as required by Cigna . . . ."

    16.    Pursuant to the terms of the applicable Plan document, **Disabled** is defined as follows:

> Initially, you're "Disabled" if you're (1) unable to perform the normal duties of your job due to an illness or injury and (2) receiving Appropriate Care and Treatment for that injury or illness. (If you're released to full duty with restrictions, you are considered able to perform the duties of your job.)
>
> After you receive 78 weeks of Plan benefits, you're "Disabled" if you're (1) unable to perform the duties of any occupation (not just your job at Schlumberger) for which you are reasonably suited due to your education, training or experience and (2) receiving Appropriate Care and Treatment for that injury or illness.

    17.    The term "Appropriate Care and Treatment" means "medical care and treatment that is:

> - provided by appropriate medical professionals;
> - consistent with a physician's diagnosis of the illness or injury causing the Disability;
> - consistent in type, frequency and duration with relevant guidelines; and
> - intended to maximize medical and functional improvement."

18. The applicable Plan document does not contain a "Proof of Loss" provision.

19. The applicable Plan document does not state or define the quantum of "proof" needed to satisfy Cigna.

20. The applicable Plan document does not require objective medical evidence to establish disability within the meaning of the Disability Program and Plan.

21. Pursuant to the Disability Program and Plan, disability claimants who remain Disabled beyond the 26-week STD maximum benefit period will immediately begin receiving LTD benefits if Cigna determines such employee meets the eligibility requirements for LTD benefits.

22. However, payment of LTD benefits under the Disability Program and Plan is contingent upon an employee receiving the maximum 26-week period of STD benefits under the Disability Program and Plan.

23. Thus, according to the prerequisites of the Disability Program and Plan, an employee is not eligible to receive LTD benefits unless he is found to be Disabled for the duration of the 26-week STD benefit period.

24. Pursuant to the Disability Program and Plan, for a claimant whose disability begins before age 60, the Maximum Benefit Period for LTD benefits is the claimant's 65th birthday.

25. The applicable Plan document does not contain a provision that limits the duration of LTD benefits in the event the disability is caused or contributed to by mental illness or a psychiatric condition.

26. In view of Plaintiff's birth date and the Plan's maximum benefit period provision, so long as he continued to be disabled, LTD benefits would be payable to Plaintiff through August 2029.

27. The appliable Plan document states that Cigna has been delegated the discretionary authority and responsibility for determining benefits under the Plan – both in processing claims and appeals.

28. The applicable Plan document advises that "[n]o benefits will be paid under the Plan unless Cigna (or the Plan Administrator on a second appeal) decides in its sole discretion you are entitled to them."

### III.   Allegations Applicable to All Claims

29. Plaintiff began working for Schlumberger in April 2018.

30. Pursuant to the job description applicable to Plaintiff's position as an Environmental Solutions Specialist, he was expected to work long hours in a safety-sensitive job that was physically and mentally demanding.

31. The normal duties of Plaintiff's job included:

- the ability to sit, stand and walk for prolonged periods of time;
- ability to move the extremities and spine through a functional range of motion that permits work to be safely performed from ground/floor level to full overhead level;
- working in awkward postures, including flexing/twisting of the body, stooping, kneeling, and squatting while simultaneously reaching;
- general functional body and extremity coordination;
- body senses to include position sense, hearing in the auditory range, and visual acuity;
- good finger dexterity and functional hand-eye coordination, and able to safely use one and two hands throughout work period when handling tools/materials for conducting maintenance and repair;
- able to perform paperwork and computer tasks;
- must be able to work with and around people; and
- able to work on jobs sites that are remote or isolated from immediate medical care.

32. Plaintiff last worked for Schlumberger on March 17, 2020. He was not able to return to work on his next scheduled work day of April 1, 2020, because of an injury or illness.

33. Plaintiff initiated a STD claim with Cigna.

34. At the claim initiation, Cigna noted that Plaintiff's debilitating condition was major depressive disorder, recurrent, severe, with suicidal ideation.

35. Upon an initial screening and review of Plaintiff's medical condition and the applicable Schlumberger job description, Cigna approved Plaintiff's STD claim for payment through April 15, 2020.

36. Because Plaintiff worked in a "field direct" position, his gross STD benefit amount is 130% of his weekly base pay.

37. Thereafter, Cigna requested medical records from Plaintiff's treating physicians and communicated directly with Plaintiff by telephone.

38. In a telephone call on April 24, 2020, Plaintiff told Cigna that his primary care physician endorsed the possibility that Plaintiff's depression and impaired memory were due to brain damage caused by sleep apnea.

39. Pursuant to its continuing review, Cigna approved Plaintiff's STD claim for payment through May 1, 2020.

40. On or about April 29, 2020, Plaintiff's primary care healthcare provider submitted information and forms in support of Plaintiff's STD claim. The Physician Assistant ("PA") principally seeing Plaintiff endorsed a primary diagnosis of "memory impairment" and opined that Plaintiff should "abstain from work until cleared by Neurology."

41. Upon review of the PA's information, Cigna approved Plaintiff's STD claim for payment through May 29, 2020.

42. On May 15, 2020, Cigna received medical records from Plaintiff's first patient encounter with a neurologist, Vitalie D. Lupu, M.D. Dr. Lupu's records included a "history of present illness" section that noted Plaintiff's impaired memory, impaired mental processing, a 10-

day psychiatric-related hospitalization, abnormal brain studies, and severe sleep apnea.

43. On May 19, 2020, a Cigna nurse reviewed Dr. Lupu's records and opined that the "[m]edical supplied for review demonstrates a functional loss."

44. The nurse explained that Plaintiff was noted to have a very labile mood, was crying on and off, and having issues with memory. The nurse further observed that the medical supplied indicated white matter changes in the brain per a MRI, and that Plaintiff had been referred for multiple tests, including a neuropsychological evaluation.

45. Cigna approved Plaintiff's STD claim for payment through August 5, 2020.

46. On August 3, 2020, while awaiting receipt of updated information and records from Dr. Lupu, Cigna approved Plaintiff's STD for payment through August 20, 2020.

47. By letter dated September 10, 2020, Cigna notified Plaintiff that it was closing his STD claim and no further benefits would be paid. Cigna explained that "we have been unable to confirm ongoing restrictions and limitations to support a disability beyond August 20, 2020."

48. In a telephone communication on September 10, 2020, Plaintiff asked Cigna to consider information from the PA.

49. Cigna subsequently asked for and received a completed "Medical Request Form" from the PA. In the Medical Request Form dated September 11, 2020, the PA endorsed a primary diagnosis of "memory impairment" and stated that Plaintiff "has cognitive and memory impairment of unknown etiology at this time."

50. With respect to Plaintiff's specific restrictions, the PA stated:

Impairment observed is problematic in terms of occupational capacity. He cannot function well in complex and potentially hazardous environments for the time being. Advised to take leave from work.

51. The PA also submitted a copy of a Neuropsychological Consultation Report

prepared by Stephen S. Meharg, Ph.D. in July 2020.

52. As reflected in Dr. Meharg's report dated July 20, 2020, his summary impression was:

> This is an abnormal neuropsychological evaluation and tends to confirm the presence of rather significant memory impairment. The type of impairment mostly relates to Ramon's capacity to encode new information, while his absolute rate of retention may be considered more normal. Typically, this type of cognitive impairment reflects difficulties in executive aspects of working memory and complex mental tracking.
>
> * * *
>
> Ramon's mental blackboard [i.e., working memory] is about the size of a postage stamp, leaving him with significant difficulties holding information in his mind at one time to allow for adequate learning and processing.
>
> * * *
>
> The degree of impairment observed would certainly be problematic in terms of Ramon's occupational capacity. His reports regarding difficulties learning procedures and multitasking in complex environments would be supported by the test findings and it is probably wise for Ramon to cease his occupational effort, especially in complex and potentially hazardous environments for the time being.
>
> * * *
>
> I find it unlikely that Ramon will be able to return to cognitive baseline levels based on damage already accumulated.

53. Dr. Meharg's diagnoses were: (1) Mild Neurocognitive Disorder due to multiple etiologies, including probable hypoxic encephalopathy secondary to chronic sleep apnea; (2) Major Depressive Disorder, recurrent, mild; (3) Alcohol Use Disorder in sustained full remission per patient report; and (4) Tobacco Use Disorder.

54. On September 28, 2020, Dr. Lupu's office visit note for September 25, 2020 was sent to Cigna. Dr. Lupu noted abnormal motor function in Plaintiff's upper and lower extremities because of diffuse muscle weakness, abnormal right knee reflex, and an abnormal gait. Dr. Lupu's

mental status observations were that Plaintiff's affect was flat and his fund of knowledge was spotty.

55. Dr. Lupu also reviewed Dr. Meharg's neuropsychological report and noted as follows:

> The patient had a neuropsychological study on 7/20/2020 with Dr. Stephen Meharg, PhD ABN. Report was reviewed with the patient. The patient also had a chance to review the report in advance to this appointment. Based on this first neurocognitive the patient was diagnosed with mild neurocognitive disorder due to multiple etiologies, including sleep apnea and major depressive disorder. Alcohol use disorder in remission and tobacco use disorder were mentioned as comorbidities. It was found that the patient's working memory was very poor and that he will not be able to return to cognitive baseline levels, unless there is successful treatment of his other conditions, namely severe sleep apnea and depression. The patient is undergoing treatment with CPAP and is followed by psychiatry.

56. Dr. Lupu's assessments were (1) forgetfulness; (2) sleep apnea; (3) severe episode of recurrent major depressive disorder, without psychotic features; (4) hearing loss; (5) gait abnormality; and (6) physical deconditioning.

57. Cigna re-reviewed its claim closure decision in light of the information and records received from the PA, Dr. Meharg, and Dr. Lupu.

58. A Cigna nurse thought that a Cigna doctor should be consulted.

59. Les Kertay, Ph.D. conducted a file review on or about October 12, 2020. Dr. Kertay opined that "the medical information does not support a psychiatric, psychological, or neuropsychological functional impairment."

60. With respect to Dr. Meharg's report and information about Plaintiff, Dr. Kertay said "the treatment provider's opinion is not well supported by medically acceptable clinical diagnosis techniques . . . ."

61. Dr. Kertay never treated, examined, or clinically observed Plaintiff.

62. Cigna immediately issued a letter on October 12, 2020, and reaffirmed to Plaintiff that it was it was denying his STD claim beyond August 20, 2020. Therein, Cigna told Plaintiff that "there was not enough evidence to support a global functional impairment" and "the evidence in the complete set of medical records we gathered does not translate to an ongoing loss of function."

63. The terms of the Disability Program and Plan don't require "a global functional impairment" in order to be entitled to STD benefits.

64. The terms of the Disability Program and Plan don't require "an ongoing loss of function" in order to be entitled to STD benefits.

65. Cigna's reliance on Dr. Kertay's review and his assertions about Plaintiff's functional impairment was unreasonable and reflects an unprincipled review.

66. In psychiatric-related claims, the opinion of one who merely reviews a written record is inherently unreliable as compared to the opinions of healthcare providers who have actually observed, examined, and treated the patient.

67. Plaintiff immediately appealed. He did not submit any additional medical records or information.

68. For its appeal processing, Cigna requested another file review be done by a different Cigna-employed physician.

69. Gitry Heydebrand, Ph.D. conducted the appeal-related file review and submitted a report. Dr. Heydebrand's conclusion was:

> The clinical findings based on the neuropsychological evaluation completed 7/20/20 by Stephen Meharg, PhD, do not support a conclusion of significant functional limitations due to cognitive impairment.

70. As reflected in his report, Dr. Heydebrand thought the performance validity data in

Dr. Meharg's report was better understood to mean Plaintiff was attempting to misrepresent his potential and feign impairment.

71. Dr. Heydebrand also expressed a methodological concern about Dr. Meharg's use of the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS") to determine Plaintiff's cognitive functioning and she criticized Dr. Meharg's reliance on such to draw conclusions about Plaintiff's overall cognitive status.

72. Last, Dr. Heydebrand criticized Dr. Meharg's etiology-related opinion and Dr. Heydebrand seemed to think chronic hypoxia related to sleep apnea was not typically associated with a permanent neurocognitive disorder.

73. Dr. Heydebrand never treated, examined, or clinically observed Plaintiff.

74. Based on Dr. Heydebrand's review, by letter dated December 18, 2020, Cigna affirmed its decision to stop paying STD benefits to Plaintiff after August 20, 2020.

75. Cigna's reliance on Dr. Heydebrand's review and her assertions about Plaintiff's functional limitation was unreasonable and reflects an unprincipled review for the same reasons noted above about Dr. Kertay's review.

76. On June 3, 2021, because Plaintiff thought Cigna's adverse claim decision was obviously unprincipled and wrong, he submitted a voluntary second appeal to the Plan Administrator, i.e., the Administrative Committee, in accordance with the terms of the Disability Program and Plan.

77. On the second appeal, Plaintiff urged that Cigna and its medical staff never specifically considered any of the normal duties of his job; rather, they used and relied on inapplicable generalities about functional losses or limitations. More specifically, Plaintiff complained that Cigna denied his claim for STD benefits without considering whether he could

actually perform his specific normal job duties.

78. On the second appeal, Plaintiff submitted a letter from Dr. Meharg in response and rebuttal to Dr. Heydebrand's report.

79. Dr. Meharg first noted that his evaluation of Plaintiff was an in-person clinical whereas Dr. Heydebrand's opinions were "based on records review only and without actual interview or evaluation of Mr. Ramos."

80. In his rebuttal letter, Dr. Meharg reiterated:

Mr. Ramos has established neurological abnormalities relating to ischemic white matter disease in both frontal and parietal areas of his brain. Combining the clinical presentation, brain imaging, and neurocognitive test data suggested to me that his cognitive complaints were likely due to a broad range of cerebrovascular risk factors, sleep apnea, and general health neglect.

81. Dr. Meharg went on to extensively debunk Dr. Heydebrand's concerns about performance validity testing and Dr. Meharg's use and reliance on the RBANS memory measures.

82. Dr. Meharg also addressed Dr. Heydebrand's etiology-related concern about the source of Plaintiff's cognitive impairment and her suggestion that Plaintiff's cognitive impairment was not attributable to chronic hypoxia due to sleep apnea. Dr. Meharg stated as follows:

Briefly, obstructive sleep apnea (OSA) is characterized by repeated complete or partial collapse of the upper airway during sleep that causes cessation of breathing, oxygen desaturation, and repetitive arousals from sleep. OSA is a clearly identified risk factor for cardiac and cerebrovascular diseases, as well as motor vehicle accidents, low work performance, and occupational accidents.

Neuropsychological and neuroimaging studies have demonstrated that OSA is associated with impairment of several cognitive functions, including attention, memory, and executive functions, as well as the brain structures underlying these functions.

Admittedly, there are controversies in this issue. Not all persons with OSA experience measurable cognitive impairment, nor are they all affected in precisely the same fashion. However, the preponderance of the evidence supports the conclusion that OSA is a substantial risk factor for daytime sleepiness and cognitive dysfunctions characterized by impairments of working memory, short term

memory, and executive functions.

83. Plaintiff's STD appeal to the Administrative Committee also included additional medical records – all of which corroborated Plaintiff's medical conditions, appropriate care and treatment for such, and that he could not perform the normal duties of his Schlumberger job.

84. Highly summarized, the additional medical records evidenced and confirmed (1) Plaintiff's obstructive sleep apnea diagnosis and continuous and appropriate treatment thereafter; (2) Plaintiff's continuing neurologic care for impaired memory and related assessment of mild cognitive impairment and obstructive sleep apnea; and (3) Plaintiff's continuing chronic depression and anxiety into 2021 and related counseling and psychiatric treatment.

85. Plaintiff urged, as a general proposition, that the evidence established he was unable to perform the normal duties of his Environmental Solutions Specialist job.

86. More specifically, Plaintiff asserted to the Administrative Committee that his illnesses rendered him unable "to work on jobs sites that are remote or isolated from immediate medical care."

87. Pursuant to his second appeal, Plaintiff asked the Administrative Committee to approve his claim for STD benefits beyond August 20, 2020 and immediately direct Cigna to initiate and approve a claim for LTD benefits.

88. In response to Plaintiff's second voluntary appeal, upon information and belief, the Administrative Committee asked Cigna to further review Plaintiff's STD claim in light of the additional information provided in the voluntary appeal submission.

89. Plaintiff's second voluntary appeal was returned to the same Cigna appeals case manager, Kristi Simpson, who decided Plaintiff's first appeal in December 2020.

90. In August 2021, Cigna determined that a neuropsychology-related Independent

Medical Exam ("IME") might be helpful in consideration of Plaintiff's second appeal and Cigna asked a third-party vendor, PsyBar LLC, to make arrangements for such.

91. Cigna requested that the IME include a full formal mental status examination ("MSE") and it provided the "referral questions" to be answered by the IME provider.

92. Russell Pella, Ph.D. conducted the neuropsychological evaluation on October 29, 2021 and November 1, 2021, and prepared a report dated November 15, 2021.

93. Dr. Pella's report related certain abnormal MSE findings, including a circumstantial thought process, limited insight and judgment, a combination of euthymic, sad, irritable, angry, and anxious mood, and an affect which was labile with a high degree of intensity at times.

94. Responding to the diagnostic hypothesis referral question, Dr. Pella endorsed a DSM-5 diagnosis of unspecified depressive disorder.

95. Responding to the referral question about whether Plaintiff was mentally, cognitively, or behaviorally impaired, Dr. Pella stated:

> As per this examination, the examinee has not been determined to be mentally, cognitively, and/or behaviorally impaired due to the lack of valid clinical data. There was no area of cognitive functioning assessed that points to impairment. While his reported history suggests that emotional and behavioral impairments have been present at various times across the course of his life, those issues have reportedly been cyclical. While a depressive disorder diagnosis was rendered, there were no valid indicators with which to adequately estimate his current psychiatric stability or symptom level beyond mere speculation, however. This is also the case for determining his level of social, occupational, or other areas of functional impairment. Thus, I have not identified valid information that warrants any medically required work activity restrictions.

96. Finally, in responding to the referral question about "functional[ities] of particular interest," Dr. Pella endorsed that he had not identified any valid information indicating impairment in each of the specified functionalities.

97. Dr. Pella's report and opinions are immaterial to Plaintiff's STD claim for benefits

after August 20, 2020 and through the remainder of the 26-week period of STD benefits because Dr. Pella's view, **in November 2021**, was only about Plaintiff's **current** psychiatric stability or symptom level and/or level of occupational impairment.

98.     Dr. Pella's report and opinions are immaterial to Plaintiff's STD claim for benefits after August 20, 2020 and through the remainder of the 26-week period of STD benefits because Dr. Pella was not asked, and did not consider, any of the normal duties of Plaintiff's Schlumberger job.

99.     Dr. Pella's report and opinions are immaterial to Plaintiff's STD claim for benefits after August 20, 2020 and through the remainder of the 26-week period of STD benefits because Dr. Pella required that which the Disability Program and Plan do not, i.e., objective medical evidence.

100.    On November 24, 2021, while unaware of the content of Dr. Pella's report, Plaintiff submitted additional information to the Administrative Committee in support of his second voluntary appeal.  Plaintiff submitted a Psychological Evaluation done by Dr. Eddie Scott on October 14, 2021 in relation to Plaintiff's ongoing claim for Social Security Disability Income ("SSDI").

101.    As may be seen in Dr. Scott's report, certain abnormal findings and observations were noted pursuant to Dr. Scott's mental status examination.

102.    The tests results from the battery of testing done by Dr. Scott indicated average to low-average range testing but the working memory score was in the extremely low range.

103.    Dr. Scott endorsed the possibility of a dementia-related neurocognitive disorder and specifically diagnosed Plaintiff with (1) depressive disorder, severe, and (2) generalized anxiety disorder, with panic.

104. By letter dated December 3, 2021, the Administrative Committee notified Plaintiff that it was upholding the denial of his STD claim.

105. Plaintiff subsequently sought to obtain a copy of all documents, records, and other information submitted, considered, or generated in the course of the Plan and/or Cigna's review on his voluntary second appeal.

106. Cigna provided the requested documents by letter dated December 13, 2021.

107. By email dated January 21, 2022, the Administrative Committee identified the documents and records reviewed and considered in deciding Plaintiff's voluntary second appeal and indicated that all such records were already in Plaintiff's possession.

108. By its email, the Administrative Committee further advised Plaintiff that the second voluntary review was "not part of the Plan's statutory obligation to provide a 'full and fair review' of the initial decision."

109. In denying Plaintiff's STD claim beyond August 20, 2020, the Plan and Cigna conducted a skewed and self-interested investigation and evaluation, failed to apply the terms of the Disability Program and Plan to Plaintiff's claim, unreasonably denied the claim in October 2020 where the medical information was essentially the same as that relied upon to approve the claim in April 2020 and thereafter, mischaracterized and cherry-picked record information in support of a claim denial while de-emphasizing or disregarding record information supportive of Plaintiff's claim, failed to consider whether Plaintiff could actually perform his specific normal job duties, unreasonably relied on the opinions of file-reviewing doctors who never observed or examined Plaintiff, and unreasonably relied on an irrelevant IME.

110. Plaintiff has exhausted his administrative remedies.

111. This action is timely filed because, pursuant to the applicable Plan document, any

deadline that applied to Plaintiff's pursuit of his claim in court was extended by the length of time taken to complete the voluntary appeal process.

### IV.   Statement of Claims

### First Claim

### ERISA – Improper Denial of Benefits

112.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 111 of this Complaint as though set forth at length herein and further alleges:

113.   At all relevant times, the terms of the Disability Program and Plan required payment of STD benefits to Plaintiff due to his debilitating impairments.

114.   The Plan's failure to pay STD benefits to Plaintiff after August 20, 2020 is contrary to the terms of the Disability Program and Plan, and is wrong, incorrect, and/or arbitrary and capricious.

115.   In determining Plaintiff's claim, the Plan, through the acts of Cigna in response to Plaintiff's first appeal, failed to provide him with a full and fair review as required by law, thereby making its final adverse claim decision wrong, unreasonable, and not supported by competent and substantial evidence.

116.   In determining Plaintiff's claim, the Plan, through the acts of its Administrative Committee in response to his voluntary second appeal, failed in its duty to administer the Plan prudently and in the interest of participants, thereby making its adverse claim decision wrong, unreasonable, and not supported by competent and substantial evidence.

117.   Plaintiff seeks a declaration from this Court that he is entitled to receive all STD benefits due him under the terms of the Disability Program and Plan, in the amounts and for the duration consistent with the terms of the Disability Program and Plan, and an Order reinstating

Plaintiff into the Plan so he may apply for and receive all future LTD benefits due him, as well as all medical, vision, dental, and life insurance coverages, if any, for which he is eligible as a disabled Schlumberger employee.

118. Alternatively, Plaintiff seeks a declaration from this Court that the Plan's final claim decision was not the product of a full and fair review and/or was made in violation of its fiduciary duty, and a related Order therefore reinstating his STD claim and remanding the matter to the Plan for a full and fair review and/or a review done consistent with the Plan's fiduciary duties.

119. By reason of the Plan's wrong, unreasonable, and/or arbitrary and capricious claim decision, Plaintiff has been forced to retain an attorney to secure the employee benefits due him under the terms of the Disability Program and Plan, for which Plaintiff has and will incur attorney's fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1). Plaintiff is entitled to recover the reasonable attorney's fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Plaintiff Ramon Ramos demands judgment against Defendant Schlumberger Group Welfare Benefits Plan, as follows:

(1) for a declaration that the Plan improperly denied Plaintiff's claim for STD benefits, and that he is entitled to receive the STD benefits due under the terms of the Plan that have not been paid, together with prejudgment and post-judgment interest thereon;

(2) for a declaration that the Plan improperly denied Plaintiff's claim for STD claim benefits, and that he is reinstated into the Plan and he may apply for and receive all future LTD benefits due him pursuant to the terms of the Plan, as well as all medical, vision, dental, and life insurance coverages, if any, for which he may also be eligible as a disabled Schlumberger employee;

(3) for a declaration that all future LTD benefits and related medical, vision, dental, and life insurance coverages, if any be paid and/or maintained pursuant to the terms of the Plan; and/or

(4) for a declaration that the Plan improperly terminated Plaintiff's STD claim and such was not the product of a full and fair review and/or was done in violation of the Plan's fiduciary duty and, that as a consequence thereof, his STD claim should be reinstated and remanded for further claims procedures;

(5) for the costs of this action and Plaintiff's attorney's fees pursuant to 29 U.S.C. § 1132(g); and

(6) for such other and further relief as may be deemed just and proper by the Court.

**Respectfully submitted,**

**SHOOK & JOHNSON, P.L.L.C.**

By: **s/ Jonathan E. Shook**
**Jonathan E. Shook, OBA #17343**
**7420 S. Yale Ave.**
**Tulsa, OK 74136**
**Telephone:  (918) 293-1122**
**Facsimile:   (918) 293-1133**

**ATTORNEY FOR PLAINTIFF**