## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RAMON RAMOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-CV-0061-CVE-JFJ |
| | ) | |
| SCHLUMBERGER GROUP WELFARE | ) | |
| BENEFITS PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Ramon Ramos filed this case alleging a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. (ERISA), after his claim for short term disability (STD) benefits was denied by the Schlumberger Group Welfare Benefits Plan (the Plan). Plaintiff argues that the Plan failed to explain its rationale for denying his final appeal of the denial of his claim for STD benefits, and he asserts that the claims administrator, Cigna Group Insurance (Cigna), arbitrarily and capriciously rejected his evidence showing that he had serious mental limitations that prevent him from working. The Plan responds that plaintiff failed to produce any credible evidence that he had any functional limitations, and it was not an abuse of discretion for the Plan to reject plaintiff's claim for disability benefits. The Plan further argues that it was not obligated to provide a detailed explanation for rejecting plaintiff's voluntary appeal, because a voluntary appeal is not subject to ERISA regulations concerning notice of an adverse decision.

## I.

Ramos was hired as an environmental specialist for Schlumberger Technology Corporation (Schlumberger) beginning in April 2018. Dkt. # 17, at 36. Schlumberger sponsors an employee benefits plan and there is an Administrative Committee (the Committee) that serves as the plan

administrator for the general administration of the Plan.[1]  Dkt. # 17-1, at 271.  The Plan provides

STD and long term disability (LTD) benefits to plan participants.  The STD and LTD benefits are

self-funded by Schlumberger, but Schlumberger has retained Cigna as the claims administrator for

the STD and LTD benefits programs.  Id. at 272.

> Under the Plan, STD benefits are payable to a claimant under the following circumstances:
>
> If you can't work for more than five consecutive calendar workdays and you meet the requirements described in this [Summary Plan Description], the Plan will pay you STD benefits.
>
> •  STD benefits will be paid from the day you are first Disabled.
>
> •  STD benefits can be paid for up to 26 weeks.
>
> •  STD benefits equal 100% of your Base Pay.

Id. at 255.  Once a claimant exhausts all 26 weeks of STD benefits, the claimant may become

entitled to LTD benefits if the claimant is still unable to work.  The Plan provides that "[b]asic LTD

benefits can be paid so long as you remain Disabled or you reach the Maximum Benefit Period

allowed under the Plan."  Id.  A claimant becomes eligible for STD benefits "if Cigna determines

that you've missed work for more than five consecutive work days due to a Disability."  Id. at 258.

Cigna requires that the claimant periodically provide proof of disability in order to continue to

receive STD benefits.  Id.  STD benefits can be terminated when the claimant is no longer disabled

or the claimant "fail[s] to provide satisfactory proof of your continuing Disability as required by

Cigna."  Id.  The definition of the term "Disabled" depends on the length of time the claimant has

received benefits under the Plan:

---

[1]   To maintain consistency with references to the Plan, the Court will refer to the Administrative Committee as the "Plan Administrator" throughout this Opinion and Order.

Initially, you're "Disabled" if you're (1) unable to perform the normal duties of your job due to an illness or injury and (2) receiving Appropriate Care and Treatment for that injury or illness. (If you're released to full duty with restrictions, you are considered able to perform the duties of your job.)

After you receive 78 weeks of Plan benefits, you're "Disabled" if you're (1) unable to perform the duties of any occupation (not just your job at Schlumberger) for which you are reasonably suited due to your education, training or experience and (2) receiving Appropriate Care and Treatment for that injury or illness.

Id. at 277. "Appropriate Care and Treatment" as defined by the Plan means medical care that is:

- provided by appropriate medical professionals;
- consistent with a physician's diagnosis of the illness or injury causing the Disability;
- consistent in type, frequency and duration with relevant guidelines; and
- intended to maximize medical and functional improvement.

Id. at 276.

The Plan delegates "the discretionary authority and responsibility for determining benefits" to Cigna, and Cigna has the discretion to "interpret the provisions of the Plan and to interpret the facts and circumstances of claims for benefits." Id. at 270. Upon the filing of a claim for disability benefits, Cigna is obligated to promptly review the claim and issue a decision within a reasonable period of time. Id. at 268. When denying an initial claim, Cigna must identify the specific reason for the denial, including a reference to any provision of the Plan on which the denial is based. Id. A claimant has the right to appeal the initial denial to Cigna within 180 days of receiving the adverse decision, and the appeal is reviewed without giving any deference to the original denial of the claim. Id. If Cigna chooses to have the appeal reviewed by a health care professional, Cigna must consult a reviewer who had no involvement with the initial decision to deny the claim. Id. at 268-69. A claimant whose initial appeal to Cigna has been denied may file a voluntary second appeal to the Plan Administrator. Id. at 269. An initial appeal to Cigna is a prerequisite before filing a lawsuit

against Cigna, but a second appeal to the Plan Administrator is entirely voluntary on the part of the claimant if he wishes to proceed with a lawsuit.  Id.  The Plan provides the following guidance concerning a second voluntary appeal:

> If you choose to make a voluntary, second appeal under the Plan, the Plan Administrator will review all of the information you provide and give you a written decision on the appeal within a reasonable time after it is received.  This typically will not be more than 90 days from the date the appeal is received.  You will not be charged any fees or costs as part of this second appeal, and any deadline (or "statute of limitations") that applies to pursuing your claim in court will be extended (or "tolled") by the length of time the voluntary appeal process takes.

Id.  The Plan states that "[a]ny decision  made by Cigna on appeal (or by the Plan Administrator on a second voluntary appeal if you choose to file one) is final and binding, unless you file suit under ERISA."  Id. at 270.

On April 6, 2020, Ramos contacted Cigna to file a claim for STD benefits, and he reported that he had last attended work on March 17, 2020.  Dkt. # 17, at 6, 14.  Ramos claimed to be suffering from major depressive disorder with suicidal ideation, and Cigna approved STD benefits through April 15, 2020.  Id. at 31, 42.  At the request of Cigna, Schlumberger produced information about Ramos' employment, including a detailed job description for Ramos' position.  Id. at 13-28. Cigna began requesting medical records from Ramos' medical providers, and a Cigna representative also spoke directly to Ramos about his claim.  Dkt. # 17-3, at 242.  Ramos stated that he was waiting to be seen by a neurologist, but he was suffering from depression and memory loss.  Id.  Ramos believed that he had brain damage that was caused by sleep apnea, and he confirmed that he was using a CPAP machine.  Id.  Ramos also advised Cigna that he received medical treatment at Ridgefield Family Medicine in Ridgefield, Washington, where he was treated by a physician's assistant, Bliss Jensen.  Dkt. # 17, at 88-96; Dkt. # 17-1, at 242.  Jensen diagnosed Ramos with an

4

undisclosed neurological impairment, and Jensen advised Ramos to refrain from working until he could be seen by a neurologist.  Id. at 96.  Cigna noted that additional treatment records and a treatment plan were necessary to determine if Ramos could continue to receive STD benefits.  Id. at 87.  On May 15, 2020, Ramos advised Cigna that he had been to a neurologist and he had been referred to several other physicians, and Cigna requested records from Ramos' visit to the neurologist.  Dkt. # 17-1, at 138.

The neurologist, Vitalie Lupu, M.D., assessed Ramos with the primary condition of "forgetfulness," but diagnosed other conditions such as white matter abnormality on MRI of brain, sleep apnea, Vitamin D deficiency, and major depressive disorder.  Dkt. # 17, at 104.  Ramos reported that he began having memory problems about two and a half years before his visit with Dr. Lupu, but his memory problems did not immediately prevent him from working.  Id. at 105.  Ramos was hospitalized in a psychiatric ward for ten days in February and March, 2020, and Ramos complained that "his brain is 'worthless.'"  Id.  Dr. Lupu proposed a treatment plan involving Vitamin D and magnesium supplements, and Dr. Lupu noted that additional neurological testing would likely be necessary.  Id. at 108.  Cigna agreed to extend Ramos' STD benefits through May 29, 2020, and Cigna directed Ramos to provide supplemental medical records no later than June 1, 2020.  Id. at 111-12.  On May 19, 2020, a Cigna nurse reviewed Dr. Lupu's examination findings and noted that Ramos had a functional loss due to "very libile mood, crying on and off, issues with memory," and MRI results indicating white matter changes.  Dkt. # 17-2, at 233.  The nurse also noted that Ramos had been referred for additional testing, and Cigna chose to extend Ramos' STD benefits until August 5, 2020.  Dkt. # 17, at 126.  On August 3, 2020, Ramos called Cigna and stated

that he would be undergoing a neuropsychological evaluation on August 14, 2020, and Cigna agreed to extend his STD benefits to August 20, 2020.  Dkt. # 17-3, at 232.

By September 10, 2020, Cigna had not received any additional medical records in support of Ramos' claim for STD benefits, and Cigna notified Ramos that it was terminating his benefits. Dkt. # 17, at 169.  Ramos contacted Cigna to ask why his STD benefits had been terminated, and he was advised that Cigna had not received any additional medical records from Dr. Lupu.  Dkt. # 17-3, at 225-26.  Ramos told the Cigna representative that he had not seen Dr. Lupu for a few months, and he asked Cigna to send a records request to Jensen.  Id.  Jensen's treatment records show that she diagnosed Ramos with a "cognitive and memory impairment  of unknown etiology," and Jensen found that Ramos could not "function well in complex and potentially hazardous environments for the time being."  Dkt. # 17, at 191.

Jensen also provided to Cigna a copy of a neuropsychological report prepared by Stephen Meharg, Ph. D, in July 2020.  Dr. Meharg conducted a battery of testing, and he noted that the results of this type of neuropsychological testing are highly affected by the subject's effort and motivation when taking the tests.  Id. at 194-95.  Ramos results on the Minnesota Multiphasic Personality Inventory (MMPI) raised concerns about the validity of Ramos' self-reported symptoms, but Dr. Mehard concluded that "minor findings mostly suggestive of some degree of carelessness in responding" did not detract from the validity of the test result.  Id. at 195.  Dr. Meharg also noted that Ramos had an unusually low score on the Test of Memory Malingering (TOMM), but he could not conclusively determine whether Ramos' low TOMM score was the result of intentional or conscious lack of effort.  Id. at 196.  This assessment was supported by Ramos's score on the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS), for which Ramos received a

passing score on the effort scale.  Id. at 196.  Ramos' RBANS results were within a normal or near-normal range as to visual spatial abilities, language, and attention.  Id. at 197.  However, his memory scores were described as "very poor," and the test results showed that Ramos had little ability to process new information.  Id.  Testing suggested that Ramas had intact memory recognition and recall of information previously learned, but Ramos had little or no ability to recall information to which he was recently exposed.  Id. at 197-98.  Dr. Meharg also found that Ramos had major depressive order of mild severity with "strong symptomatic elements of both general fatigue as well as significant cognitive disruption."  Id. at 200.  Dr. Meharg summarized the results of the examination as abnormal and testing "tends to confirm the presence of a rather significant memory impairment."  Id.  He described Ramos as having the "mental blackboard . . . about the size of a postage stamp," and the examination findings were consistent with "ischemic white matter disease in both frontal and parietal pathways."  Id.

On September 16, 2020, Cigna noted receipt of Dr. Meharg's report and the claim file shows that the information would be reviewed by a physician.  Id. at 208.  Ramos visited Dr. Lupu while the physician review of his file was pending, and Ramos continued to complain of memory problems, severe sleep apnea, and depression.  Id. at 226.  Dr. Lupu noted a lack of indicia for a diagnosis of dementia, but Dr. Lupu ordered a brain PET scan and he requested copies of Ramos' brain MRI scans from March 2020.  Id. at 225.  Dr. Lupu found that Ramos was properly oriented to place and time, but Ramos' "fund of knowledge [was] spotty."  Id. at 227.  Dr. Lupu also referred Ramos for physical therapy, occupational therapy, and speech and language therapy.  Id. at 225.  The treatment notes show that Dr. Lupu diagnosed Ramos with the following conditions:

1.  Forgetfulness

2. Sleep Apnea
3. Severe episode of recurrent depressive disorder, without psychotic features (HCC)
4. Hearing Loss
5. Gait abnormality
6. Physical deconditioning

Id. at 225.

Les Kertay, Ph. D., conducted a file review as part of the evaluation of Ramos' claim for STD benefits, and Dr. Kertay substantially disagreed with Dr. Metarg's interpretation of Ramos' neurocognitive test results.   Dr. Kertay stated that the materials he reviewed included Dr. Metarg's report, notes from Ramos' September 25, 2020 visit to Dr. Lupu, and the September 11, 2020 medical request form prepared by Jensen, but Dr. Kertay clearly focused on Dr. Metarg's findings concerning plaintiff's mental limitations.  Dkt. # 17-5, at 19.  Dr. Kertay noted Ramos' scores on the TOMM test and viewed this an indication that Ramos did not give full effort on the neurocognitive testing.  Id. at 20.  Dr. Kertay rejected Dr. Metarg's opinion that other evidence suggested that factors beyond Ramos' control prevented Ramos from fully focusing on the neurocognitive testing, and Dr. Kertay believed that it was unreasonable for Dr. Metarg to rely on the testing in support of any diagnosis of Ramos' alleged mental health problems.  Id. at 20-21.  Dr. Kertay also believed that Dr. Metarg's reliance on the RBANS test as a diagnostic tool was misplaced, because Dr. Kertay opined that RBANS was simply a screening test that would indicate that additional neurocognitive testing was necessary.  Id. at 21.  Dr. Kertay considered Ramos's results on other testing in support of his opinion that Ramos retained the ability to complete complex tasks and interpret new information, and he found that Ramos' alleged symptoms would not be caused by a hypoxic injury consistent with sleep apnea.  Id.  The only possible condition that Dr. Kertay found would be supported by the medical evidence was a mild case of depression, but Dr. Kertay did not find any evidence suggesting

8

that depression alone would cause any functional limitations that would prevent Ramos from working.  Id. at 21-22.

On October 12, 2020, Cigna issued a letter formally denying Ramos' claim for STD benefits as of August 20, 2020, and Cigna advised Ramos that he had a right to appeal the adverse decision. Dkt. # 17, at 240-42.  Ramos appealed the denial the next day and he chose not to submit any additional medical records in support of his appeal.  Id. at 244; Dkt. # 21, at 16.  Cigna provided the same medical records reviewed by Dr. Kertay to a second psychologist, Gitry Heydebrand, Ph. D., for an opinion as to Ramos' functional capacity.  Id. at 262-64.  Dr. Heydebrand concluded that Ramos had no psychiatric conditions that would cause any functional limitations, and she determined that Ramos' scores on the TOMM test were consistent with persons who were "deliberately attempting to misrepresent their potential and to feign impairment." Id. at 264.  Dr. Heydebrand also rejected Dr. Metarg's reliance on RBANS as a diagnostic tool, and she criticized Dr. Metarg's failure to obtain multiple sources of data in support of his opinions concerning Ramos' alleged limitations. Id. at 22.  Dr. Heydebrand found no valid or reliable evidence suggesting that Ramos had any functional limitations due to a cognitive impairment.  Id.  On December 18, 2020, Cigna sent Ramos a letter denying his appeal, and Cigna advised Ramos that he could file a lawsuit asserting an ERISA claim or a second voluntary appeal if he disagreed with Cigna's decision.  Id. at 273-276.

Ramos initially sent letters to the Plan Administrator requesting Plan documents that he believed were applicable to his claim for STD benefits.  Dkt. # 17-1, at 280-82.  The Plan provided the requested documents to Ramos in February 2021, and he also received a copy of the claim file. Dkt. # 17, at 288; Dkt. # 17-1, at 206.  On June 3, 2021, Ramos filed a second voluntary appeal to the Plan Administrator, and he submitted additional medical records and arguments in support of his

claim for STD benefits.  Dkt. # 17-1, at 289-301.  In particular, Ramos complained that neither Dr. Kertay nor Dr. Heydebrand considered the actual duties of Ramos' job and, instead, they relied on general terms such as "global functional loss, loss of function, or significant functional limitations" that are not part of the definition of "disability" under the Plan.  Id. at 295.  Ramos provided a supplemental letter from Dr. Meharg addressing Dr. Heydebrand's rejection of his clinical findings concerning Ramos' effort when taking neurological testing, Dr. Meharg's reliance on RBANS as a means of assessing Ramos' memory capacity, and the role of sleep apnea in causing a coginitive impairment.  Id. at 302-05; Dkt. # 17-2, at 1-2.  Dr. Meharg argued that it was unreasonable for Dr. Heydebrand to conclude that Ramos was exaggerating the severity of his symptoms based solely on the TOMM test, and Dr. Meharg stated that it was necessary to consider the totality of the neurocognitive testing results and Dr. Meharg's personal observations of Ramos during the testing. Dkt. # 17-1, at 304-05.  He recognized that RBANS is not the most comprehensive test for memory capacity, but lengthier and less humane testing would likely have shown the same results.  Dkt. # 17-2, at 1.  Dr. Meharg also cited studies supporting his finding that inadequately treated sleep apnea contributed to Ramos' neurological deficits.  Id. at 2.  Based on the documents already in the claim file and the new evidence, Ramos asked the Committee to reinstate his STD benefits as of August 20, 2020 and direct Cigna to approve a claim for LTD benefits.  Dkt. # 17-1, at 300.

The Plan Administrator acknowledge receipt of Ramos' second voluntary appeal and asked him to undergo an independent medical examination (IME). Dkt. # 17-3, at 302-03.  Ramos agreed to participate in an IME, and the Plan Administrator sought Cigna's assistance in setting up the IME. Id. at 307-08.  Ramos was referred to Russell Pella, Ph. D., for an IME, and Dr. Pella noted that the results of the examination were "within the range of invalid performance."  Dkt. # 17, at 308.  Dr.

Pella described Ramos as suspicious, defensive, and uncooperative during the examination, and his answers to questions were frequently of minimal value in determining his mental conditions and limitations.  Id. at 307-08.  Ramos reported that he suffered from significant memory loss and difficulty with maintaining focus on even simple tasks, and he is frequently angry and loses his temper easily.  Id. at 312.  However, Dr. Pella rejected Dr. Meharg's conclusions concerning Ramos' limitations and memory problems, and he found that Ramos' lack of candor and over-reporting of symptoms resulted in entirely invalid testing that was not useful in determining if Ramos had a mental health impairment or functional limitations.  Id. at 315-16.

While the second voluntary appeal was pending, Ramos participated in a psychological evaluation as part of his claim for Social Security disability benefits.  The examiner, Eddie Scott, Ph. D., noted that Ramos was oriented to person, place, and time, but Ramos tended to ramble when speaking and frequently forgot the topic of the conversation.  Dkt. # 17-4, at 10.  Ramos's mood was described as anxious and depressed and he became tearful when discussing his condition.  Id. at 11.  Ramos told Dr. Scott that he had previously attempted suicide and he would likely kill himself if it were not for his 11 year old daughter.  Id.  Ramos reported that he was hospitalized in March 2020 after having a panic attack, and an MRI allegedly showed that Ramos was possibly suffering from vascular dementia.  Id. at 12.  When asked about conditions that prevented him from working, Ramos identified lower back pain and bulging discs as physical impairments, but he stated that mental impairments such severe memory problems and lack of concentration made it dangerous for him to return to his previous employment.  Id. at 13.  Dr. Scott performed a battery of testing known as the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV), and Ramos' IQ score of 82 was in the low average range.  Id. at 14.  However, Ramos' working memory score was in the extremely

11

low range, and Dr. Scott could not rule out the possibility of a learning disability or dementia as a cause of his mental limitations.  Id.  Dr. Scott found no evidence that Ramos was feigning or exaggerating his symptoms, and he also found that Ramos' condition was unlikely to improve over the next year.  Id. at 15.  Ramos provided Dr. Scott's report to the Plan Administrator while his voluntary appeal was pending.  Id. at 9.

On December 3, 2021, the Plan Administrator issued its decision denying Ramos' second voluntary appeal.  Id. at 19.  The single-page denial letter states that the Committee reviewed the claim file, Dr. Scott's evaluation report, and the results of Dr. Pella's IME.  Id.  The denial letter does not explain the reasoning or rationale for the Plan Administrator's decision, and Ramos asked the Plan Administrator to provide him "all documents, records, and other information submitted, considered, or generated in the course of the Plan's and/or Cigna's review on Mr. Ramos' voluntary appeal."  Id. at 26.  The Plan provided some additional documents to Ramos, but Ramos' attorney subsequently clarified that he was seeking documents or communications reflecting the reasoning or rationale supporting the Plan Administrator's decision on Ramos' voluntary appeal.  Dkt. # 17-5, at 1.  The Plan Administrator responded that all documents responsive to Ramos' request were already in his possession, and the second voluntary appeal was not part of the Plan's obligation to provide a "full and fair review" of the initial denial of Ramos' claim for STD benefits.  Id. at 28. On February 8, 2022, Ramos filed this case alleging an ERISA claim on the ground that the Plan improperly denied his claim for STD benefits.  Dkt. # 2.  Ramos asks the Court to order the Plan to reinstate his STD benefits and allow him to apply for and receive any other benefits available to a disabled person as an employee of Schlumberger.  Id. at 18.  Ramos alternatively requests that the Court remand the case to the Plan for a full and fair review of his claim for STD benefits.  Id.

## II.

Plaintiff argues that the Plan Administrator's decision to deny his second voluntary appeal is arbitrary and capricious, because the Plan Administrator provided no reasoning or rationale for the denial of plaintiff's appeal.  Dkt. # 21, at 27-28.  Plaintiff further argues that Cigna and the Plan wholly failed to consider the duties of plaintiff's job at every level of review, and this provides a basis to reverse the adverse decision and retroactively award him benefits.  Id. at 31-32.  Defendant responds that the Plan Administrator's denial of plaintiff's voluntary appeal is irrelevant to plaintiff's ERISA claim, because the Plan Administrator's ruling on a voluntary appeal is not the final decision on plaintiff's claim for STD benefits that is subject to judicial review.  Dkt. # 22, at 22-23.  Defendant claims that it was unnecessary for it or the Plan Administrator to consider the actual duties of plaintiff's job at any step of the review, because plaintiff failed to present any evidence showing that he had mental limitations that prevented him from working.  Id. at 18.

**Standard of Review**

As a preliminary matter the Court must establish the proper standard of review for plaintiff's ERISA claim.  Plan beneficiaries, like plaintiff, have the right to federal court review of benefit denials and terminations under ERISA.  "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989).  Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  The default standard of review is de novo. However, when a plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under §

1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard.  See Firestone, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms of a plan).

The parties agree that the arbitrary and capricious standard applies in this case. Dkt. # 21, at 26-27; Dkt. # 22, at 14-15.  The Plan expressly gives Cigna "the discretionary authority and responsibility for determining benefits under the Plan," and Cigna has the "discretionary authority to interpret the provisions of the Plan and to interpret the facts and circumstances of claims for benefits.  Dkt. # 17-1, at 269-70.  On a second voluntary appeal, the Committee has the "sole discretion" to determine whether a claimant is entitled to benefits.  Id. at 270.

Under the arbitrary and capricious standard of review, a plan administrator's or fiduciary's decision will be upheld "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).  That basis "need not be the only logical one nor even the best one."  Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999)). The decision merely must "reside[] 'somewhere on a continuum of reasonableness – even if on the low end." Adamson, 455 F.3d at 1212  (quoting Kimber, 196 F.3d at 1098).  A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith."  Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).  The Tenth Circuit has stated that courts reviewing a denial of benefits under the arbitrary and capricious standard should consider if the denial "(1) was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." D.K. v. United Behavioral

Health, 67 F.4th 1224, 1236 (10th Cir. 2023).   "The 'consistent with the purpose of the plan' requirement means a plan administrator acts arbitrarily and capriciously if the administrator 'fail[s] to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'"  Id. (quoting Tracy O. v Anthem Blue Cross Life & Health Ins., 807 F. App'x 845, 854 (10th Cir. 2020)).

"Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary."  Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002).  The Tenth Circuit has held that "'[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'  Substantial evidence requires 'more than a scintilla but less than a preponderance.'"  Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted).  In reviewing the plan administrator's or fiduciary's decision, the reviewing court generally is "limited to the 'administrative record' – the materials compiled by the [decisionmaker] in the course of making [the] decision."  Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002).   The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence.  Caldwell, 287 F.3d at 1282.

If an ERISA fiduciary plays more than one role – i.e., deciding eligibility and paying benefits claims out of its own pocket – a conflict of interest arises.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008); Graham v. Hartford Life & Acc. Ins. Co., 589 F.3d 1345, 1358 (10th Cir. 2009). In Glenn, the Supreme Court rejected any argument that this conflict of interest requires courts to shift the burden of proof to the plan administrator in cases where a conflict of interest exists.  Glenn,

554 U.S. at 117. "Glenn embraces . . . a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'" Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting Glenn, 554 U.S. at 118). "A conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .'" Id. (quoting Glenn, 554 U.S. at 117). In this case, Cigna does not fund the benefits plan and is not responsible for paying benefits to a successful claimant, and the Court will not reduce the deference given to Cigna's decision based upon a conflict of interest. However, the Plan is self-funded by Schlumberger, and the Plan Administrator may have a conflict of interest if Schlumberger is ultimately responsible for paying disability benefits and issuing a final decision pursuant to a second voluntary appeal. The Court will determine the level of deference to be given to the Plan Administrator's decision on the second voluntary appeal if the Court finds that the this decision is subject to judicial review and the Plan Administrator provided sufficient reasoning or rationale in support of its decision to deny plaintiff's claim for STD benefits.

**Second Voluntary Appeal**

The parties dispute whether the Court can review the Plan Administrator's ruling on the second voluntary appeal as part of plaintiff's ERISA claim and whether the procedural requirements of 29 U.S.C. § 1133 apply to the Plan Administrator's review of plaintiff's voluntary appeal. ERISA requires that every employee benefit plan:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  In order to comply with § 1133(1), a denial notice must state the specific reason for the denial or adverse decision, must identify the specific plan provision on which the decision is based, and must describe what additional material or information could be submitted by a claimant to perfect the claim.  29 C.F.R. § 2560.503-1(g)(1); David P. v. United  Healthcare Ins. Co., 77 F. 4th 1293, 1299 (10th Cir. 2023).   Under § 1133(2), a "full and fair" review by the decision maker must include "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." D.K., 67 F.4th at 1236 (quoting Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 893-94 (10th Cir. 1988)).  A court's review of an ERISA claim is limited to "those rationales that were specifically articulated in the administrative record as the basis for denying a claim." Ian C. v. United Healthcare Ins. Co., ___ F. 4th ___, 2023 WL 8408199 (10th Cir. Dec. 5, 2023).

Neither ERISA nor the regulations promulgated by the Department of Labor expressly state whether statutory or regulatory requirements applicable to a mandatory appeal also apply to a voluntary appeal of the denial of a benefits claim.  ERISA regulations acknowledge that a benefits plan may provide a voluntary appeal, and a benefits plan may not punish a claimant for seeking a voluntary appeal or argue that the statute of limitations to file an ERISA claim expired while the

voluntary appeal was pending.  29 C.F.R. § 2560.503-1(c).  The Tenth Circuit has not considered whether a voluntary appeal of the denial of benefits is a binding decision that is subject to judicial review.  The parties have cited several cases addressing whether a voluntary appeal must comply with the requirements applicable to a mandatory appeal.  Jacowski v. Kraft Heinz Foods Co., 2016 WL 6693588 (W.D. Wis. Nov. 14, 2016) (the plan administrator was permitted to limit the scope of a voluntary appeal and not follow all of the procedures required for a mandatory appeal); Prezioso v. Prudential Ins. Co. of America, 748 F.3d 797(8th Cir. 2014) (manner in which fiduciary handled a voluntary appeal did not affect the standard of review applicable to mandatory statutory appeal of adverse decision); Harvey v. Standard Ins. Co., 503 F. App'x 845 (11th Cir. Jan. 14, 2013) (plan administrator's failure to timely rule on a voluntary appeal which it agreed to provide, although not specifically provided for in the benefits plan, had no bearing on whether the plaintiff received a full and fair review of her benefits claim).

Contrary to Cigna's assertion, the law is not clear that a voluntary appeal expressly permitted by a benefits plan is exempt from the requirements applicable to a mandatory statutory appeal.  Each of the cases cited by Cigna focuses on a distinct procedural issue and none of the cases stands for the broad proposition that a voluntary appeal is never subject to ERISA regulations.  Instead of relying on general and unhelpful case law, the Court will consider the terms of the Plan and determine whether the parties intended for a second voluntary appeal to be subject to judicial review.  When interpreting an ERISA plan, federal courts apply federal common law to resolve issues of contract interpretation, rather than state contract law.  Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1250 (10th Cir. 2007).  The Court must consider the benefits plan as a whole and apply unambiguous provisions as written.  Carlile v. Reliance Standard Life Ins. Co., 988 F.3d 1217, 1223

18

(10th Cir. 2021). However, an ambiguity may exist if a plan provision is subject to more than one reasonable interpretation or there is uncertainty as to the meaning of a term, and ambiguous terms "'must be construed against [the insurer] in accordance with the doctrine of *contra proferentem*,' which 'construes all ambiguities against the drafter.'" Id. (quoting Miller, 502 F.3d at 1253).

In this case, the Plan requires that a claimant complete an appeal to Cigna before filing suit against "the Plan, the Plan Administrator, or Cigna . . . ." The Plan allows for the filing of a voluntary appeal to the Plan Administrator if a claimant's initial appeal is denied by Cigna, and the language of the Plan is clear that an appeal to the Committee is not required before filing an ERISA claim. Dkt. # 17-1, at 269 ("You do not have to make this second appeal before filing a lawsuit under ERISA for Plan benefits"). If a claimant chooses to file a voluntary second appeal, "the Plan Administrator will review all of the information you provide and give you a written decision on the appeal within a reasonable time after it is received." Id. The Plan further states that "[a]ny decision by Cigna on appeal (or by the Plan Administrator on a second voluntary appeal if you choose to file one) is final and binding, unless you file suit under ERISA. Id. at 270.

Considering the Plan as a whole, the Court finds that the Plan is ambiguous as to whether the Committee's decision on plaintiff's second voluntary appeal was intended to be the final decision on plaintiff's claim for STD benefits. The Plan clearly permits a claimant to bring an ERISA claim after the denial of an initial appeal to Cigna, and this suggests that the Plan intends for Cigna's decision to be final. However, the Plan also permits a voluntary appeal to the Plan Administrator after the denial of an initial appeal by Cigna. Unlike in Jacowski, the Plan Administrator did not reserve the discretionary authority to decline to hear a voluntary appeal or limit the scope of a voluntary appeal, and the Plan clearly states that "the Plan Administrator will review all of the

19

information you provide and give you a written decision on the appeal within a reasonable time . . . ." Dkt. # 17-1, at 269.  This is mandatory language requiring the Plan Administrator to consider a voluntary appeal and issue a written decision.  The Plan also states that a decision by the Plan Administrator on a second voluntary appeal is "final and binding," and this supports plaintiff's argument that the Plan Administrator's decision is subject to judicial review.  Schlumberger could have drafted the policy in a manner that specified that a voluntary appeal to the Plan Administrator was discretionary on the part of the Plan Administrator or that a voluntary appeal was not intended to supersede Cigna's decision.  Instead, the Plan plainly states that "[a]ny decision . . . by the Plan Administrator on a second voluntary appeal . . . is final and binding.  Id. at 270.  Schlumberger is free to amend the Plan to more clearly state that it does not intend for a decision on a second voluntary appeal to be "final and binding," but the Plan as currently written treats the Plan Administrator's decision on a voluntary appeal as the final decision on a claim for disability benefits.

For the purpose of plaintiff's ERISA claim, the Plan Administrator's decision on plaintiff's second voluntary appeal is the final decision that is subject to judicial review.  However, as plaintiff points out, the Court would have to speculate as to the basis for the Plan Administrator's denial of plaintiff's claim for STD benefits.  Dkt. # 21, at 28-30.  The Plan Administrator's denial letter simply states that it reviewed the claim file, Dr. Scott's evaluation report, and the results of the IME conducted by Dr. Pella, and the "result of the review is that the Committee has decided to uphold the denial of the claim."  Dkt. # 17-4, at 19.  This is not a sufficient basis for judicial review of plaintiff's ERISA claim.  The Court declines to speculate on the possible basis for the Plan Administrator's decision and, instead, finds that it is appropriate to remand this matter to the Plan Administrator for clarification of its decision.  Ramos argues that the Plan Administrator's failure

to explain the basis for its denial of his second voluntary appeal was arbitrary and capricious, and he argues that an award of benefits is the appropriate remedy.  Dkt. # 21, at 34; Dkt. # 23, at 8-10. The Tenth Circuit has explained that courts must focus on the "specific flaws in the plan administrator's decision" to determine the appropriate remedy, and remand is the appropriate remedy when "the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."  David P., 77 F.4th at 1315.  The Court has identified a procedural error and has not reached plaintiff's arguments concerning the merits of Cigna's or the Plan Administrator's decisions to deny plaintiff's claim for STD benefits, and remand is clearly the appropriate remedy in this case.

**IT IS THEREFORE ORDERED** that plaintiff's claim for short-term disability benefits is remanded for further proceedings consistent with this Opinion and Order.  A separate judgment is entered herewith.

**DATED** this 22nd day of December, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE