## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **RAMON RAMOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-CV-0061-CVE-JFJ** |
| | ) | |
| **SCHLUMBERGER GROUP WELFARE** | ) | |
| **BENEFITS PLAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Ramon Ramos filed this case alleging a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. (ERISA), after his claim for short term disability (STD) benefits was denied by the Schlumberger Group Welfare Benefits Plan (the Plan). Plaintiff asks the Court to review the denial of benefits under a de novo standard of review and reverse the Plan's decision denying his STD benefits claims. Dkt. # 48. The Plan responds that plaintiff failed to produce any credible evidence that he had any functional limitations that would prevent him from working, and it was not an abuse of discretion for the Plan to reject plaintiff's claim for STD benefits.

## I.

Ramos was hired as an environmental specialist for Schlumberger Technology Corporation (Schlumberger) beginning in April 2018. Dkt. # 17, at 36. Schlumberger sponsors an employee benefits plan and there is an Administrative Committee (the Committee) that serves as the plan administrator for the general administration of the Plan.[1]  Dkt. # 17-1, at 271. The Plan provides

---

[1]    To maintain consistency with references to the Plan, the Court will refer to the Administrative Committee as the "Plan Administrator" throughout this Opinion and Order.

STD and long term disability (LTD) benefits to plan participants.  The STD and LTD benefits are self-funded by Schlumberger, but Schlumberger has retained Cigna as the claims administrator for the STD and LTD benefits programs.  Id. at 272.

> Under the Plan, STD benefits are payable to a claimant under the following circumstances:
>
> If you can't work for more than five consecutive calendar workdays and you meet the requirements described in this [Summary Plan Description], the Plan will pay you STD benefits.
>
> •      STD benefits will be paid from the day you are first Disabled.
>
> •      STD benefits can be paid for up to 26 weeks.
>
> •      STD benefits equal 100% of your Base Pay.

Id. at 255.  Once a claimant exhausts all 26 weeks of STD benefits, the claimant may become eligible for LTD benefits if the claimant is still unable to work.  The Plan provides that "[b]asic LTD benefits can be paid so long as you remain Disabled or you reach the Maximum Benefit Period allowed under the Plan."  Id.  A claimant becomes eligible for STD benefits "if Cigna determines that you've missed work for more than five consecutive work days due to a Disability."  Id. at 258. Cigna requires that the claimant periodically provide proof of disability in order to continue to receive STD benefits.  Id.  STD benefits can be terminated when the claimant is no longer disabled or the claimant "fail[s] to provide satisfactory proof of your continuing Disability as required by Cigna."  Id.  The definition of the term "Disabled" depends on the length of time the claimant has received benefits under the Plan:

> Initially, you're "Disabled" if you're (1) unable to perform the normal duties of your job due to an illness or injury and (2) receiving Appropriate Care and Treatment for that injury or illness.  (If you're released to full duty with restrictions, you are considered able to perform the duties of your job.)

2

> After you receive 78 weeks of Plan benefits, you're "Disabled" if you're (1) unable to perform the duties of any occupation (not just your job at Schlumberger) for which you are reasonably suited due to your education, training or experience and (2) receiving Appropriate Care and Treatment for that injury or illness.

Id. at 277. "Appropriate Care and Treatment" as defined by the Plan means medical care that is:

- • provided by appropriate medical professionals;
- • consistent with a physician's diagnosis of the illness or injury causing the Disability;
- • consistent in type, frequency and duration with relevant guidelines; and
- • intended to maximize medical and functional improvement.

Id. at 276.

The Plan delegates "the discretionary authority and responsibility for determining benefits" to Cigna, and Cigna has the discretion to "interpret the provisions of the Plan and to interpret the facts and circumstances of claims for benefits." Id. at 270. Upon the filing of a claim for disability benefits, Cigna is obligated to promptly review the claim and issue a decision within a reasonable period of time. Id. at 268. When denying an initial claim, Cigna must identify the specific reason for the denial, including a reference to any provision of the Plan on which the denial is based. Id. A claimant has the right to appeal the initial denial to Cigna within 180 days of receiving the adverse decision, and the appeal is reviewed without giving any deference to the original denial of the claim. Id. If Cigna chooses to have the appeal reviewed by a health care professional, Cigna must consult a reviewer who had no involvement with the initial decision to deny the claim. Id. at 268-69. When this case was originally filed, a claimant whose initial appeal to Cigna had been denied could file a voluntary second appeal to the Plan Administrator. Id. at 269. An initial appeal to Cigna is a prerequisite before filing a lawsuit against Cigna, but a second appeal to the Plan Administrator was entirely voluntary on the part of the claimant if he wished to proceed with a lawsuit. Id. The Plan provided the following guidance concerning a second voluntary appeal:

> If you choose to make a voluntary, second appeal under the Plan, the Plan Administrator will review all of the information you provide and give you a written decision on the appeal within a reasonable time after it is received. This typically will not be more than 90 days from the date the appeal is received. You will not be charged any fees or costs as part of this second appeal, and any deadline (or "statute of limitations") that applies to pursuing your claim in court will be extended (or "tolled") by the length of time the voluntary appeal process takes.

Id. The Plan states that "[a]ny decision made by Cigna on appeal (or by the Plan Administrator on a second voluntary appeal if you choose to file one) is final and binding, unless you file suit under ERISA." Id. at 270.

On April 6, 2020, Ramos contacted Cigna to file a claim for STD benefits, and he reported that he had last attended work on March 17, 2020. Dkt. # 17, at 6, 14. Ramos claimed to be suffering from major depressive disorder with suicidal ideation, and Cigna approved STD benefits through April 15, 2020. Id. at 31, 42. At the request of Cigna, Schlumberger produced information about Ramos' employment, including a detailed job description for Ramos' position. Id. at 13-28. Cigna began requesting medical records from Ramos' medical providers, and a Cigna representative also spoke directly to Ramos about his claim. Dkt. # 17-3, at 242. Ramos stated that he was waiting to be seen by a neurologist, but he was suffering from depression and memory loss. Id. Ramos believed that he had brain damage that was caused by sleep apnea, and he confirmed that he was using a CPAP machine. Id. Ramos also advised Cigna that he received medical treatment at Ridgefield Family Medicine in Ridgefield, Washington, where he was treated by a physician's assistant, Bliss Jensen. Dkt. # 17, at 88-96; Dkt. # 17-1, at 242. Jensen diagnosed Ramos with an undisclosed neurological impairment, and Jensen advised Ramos to refrain from working until he could be seen by a neurologist. Dkt. # 17, at 96. Cigna noted that additional treatment records and a treatment plan were necessary to determine if Ramos could continue to receive STD benefits. Id.

4

at 87.  On May 15, 2020, Ramos advised Cigna that he had been to a neurologist and he had been referred to several other physicians, and Cigna requested records from Ramos' visit to the neurologist.  Dkt. # 17-1, at 138.

The neurologist, Vitalie Lupu, M.D., assessed Ramos with the primary condition of "forgetfulness," but diagnosed other conditions such as white matter abnormality on MRI of brain, sleep apnea, Vitamin D deficiency, and major depressive disorder.  Dkt. # 17, at 104.  Ramos reported that he began having memory problems about two and a half years before his visit with Dr. Lupu, but his memory problems did not immediately prevent him from working.  Id. at 105.  Ramos was hospitalized in a psychiatric ward for ten days in February and March, 2020, and Ramos complained that "his brain is 'worthless.'"  Id.  Dr. Lupu proposed a treatment plan involving Vitamin D and magnesium supplements, and Dr. Lupu noted that additional neurological testing would likely be necessary.  Id. at 108.  Cigna agreed to extend Ramos' STD benefits through May 29, 2020, and Cigna directed Ramos to provide supplemental medical records no later than June 1, 2020.  Id. at 111-12.  On May 19, 2020, a Cigna nurse reviewed Dr. Lupu's examination findings and noted that Ramos had a functional loss due to "very libile mood, crying on and off, issues with memory," and MRI results indicating white matter changes.  Dkt. # 17-2, at 233.  The nurse also noted that Ramos had been referred for additional testing, and Cigna chose to extend Ramos' STD benefits until August 5, 2020.  Dkt. # 17, at 126.  On August 3, 2020, Ramos called Cigna and stated that he would be undergoing a neuropsychological evaluation on August 14, 2020, and Cigna agreed to extend his STD benefits to August 20, 2020.  Dkt. # 17-3, at 232.

By September 10, 2020, Cigna had not received any additional medical records in support of Ramos' claim for STD benefits, and Cigna notified Ramos that it was terminating his STD

benefits.  Dkt. # 17, at 169.  Ramos contacted Cigna to ask why his STD benefits had been terminated, and he was advised that Cigna had not received any additional medical records from Dr. Lupu.  Dkt. # 17-3, at 225-26.  Ramos told the Cigna representative that he had not seen Dr. Lupu for a few months, and he asked Cigna to send a records request to Jensen.  Id.  Jensen's treatment records show that she diagnosed Ramos with a "cognitive and memory impairment of unknown etiology," and Jensen found that Ramos could not "function well in complex and potentially hazardous environments for the time being."  Dkt. # 17, at 191.

Jensen also provided to Cigna a copy of a neuropsychological report prepared by Stephen Meharg, Ph. D, in July 2020.  Dr. Meharg conducted a battery of testing, and he noted that the results of this type of neuropsychological testing are highly affected by the subject's effort and motivation when taking the tests.  Id. at 194-95.  Ramos' results on the Minnesota Multiphasic Personality Inventory (MMPI) raised concerns about the validity of Ramos' self-reported symptoms, but Dr. Mehard concluded that "minor findings mostly suggestive of some degree of carelessness in responding" did not detract from the validity of the test results.  Id. at 195.  Dr. Meharg also noted that Ramos had an unusually low score on the Test of Memory Malingering (TOMM), but he could not conclusively determine whether Ramos' low TOMM score was the result of intentional or conscious lack of effort.  Id. at 196.  This assessment was supported by Ramos's score on the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS), for which Ramos received a passing score on the effort scale.  Id. at 196 ("Taken together, these findings tend not to suggest an individual intentionally subverting their memory performance but, nonetheless, indicate the highly fluctuating nature of Ramon's attentional capacity").  Ramos' RBANS results were within a normal or near-normal range as to visual spatial abilities, language, and attention.  Id. at 197.

6

However, Dr. Meharg described Ramos' scores on the learning and short term memory portions of the test as "extremely deficient," and the test results showed that Ramos had little ability to process new information.  Id.  Testing suggested that Ramos had intact memory recognition and recall of information previously learned, but Ramos had little or no ability to recall information to which he was recently exposed.  Id. at 197-98.  Dr. Meharg also found that Ramos had major depressive order of mild severity with "strong symptomatic elements of both general fatigue as well as significant cognitive disruption."  Id. at 200.  Dr. Meharg summarized the results of the examination as abnormal and testing "tends to confirm the presence of a rather significant memory impairment."  Id.  He described Ramos as having the "mental blackboard . . . about the size of a postage stamp," and the examination findings were consistent with "ischemic white matter disease in both frontal and parietal pathways."  Id.

On September 16, 2020, Cigna noted receipt of Dr. Meharg's report and the claim file shows that the information would be reviewed by a physician.  Id. at 208.  Ramos visited Dr. Lupu while the physician review of his file was pending, and Ramos continued to complain of memory problems, severe sleep apnea, and depression.  Id. at 226.  Dr. Lupu noted a lack of indicia for a diagnosis of dementia, but Dr. Lupu ordered a brain PET scan and he requested copies of Ramos' brain MRI scans from March 2020.  Id. at 225.  Dr. Lupu found that Ramos was properly oriented to place and time, but Ramos' "fund of knowledge [was] spotty."  Id. at 227.  Dr. Lupu also referred Ramos for physical therapy, occupational therapy, and speech and language therapy.  Id. at 225.  The treatment notes show that Dr. Lupu diagnosed Ramos with the following conditions:

1.  Forgetfulness
2.  Sleep Apnea
3.    Severe episode of recurrent depressive disorder, without psychotic features (HCC)

7

    4. Hearing Loss
    5. Gait abnormality
    6. Physical deconditioning

Id. at 225.

Les Kertay, Ph. D., conducted a file review as part of the evaluation of Ramos' claim for STD benefits, and Dr. Kertay substantially disagreed with Dr. Meharg's interpretation of Ramos' neurocognitive test results. Dr. Kertay stated that the materials he reviewed included Dr. Meharg's report, notes from Ramos' September 25, 2020 visit to Dr. Lupu, and the September 11, 2020 medical request form prepared by Jensen, but Dr. Kertay clearly focused on Dr. Meharg's findings concerning plaintiff's mental limitations. Dkt. # 17-5, at 19. Dr. Kertay noted Ramos' scores on the TOMM test and viewed this an indication that Ramos did not give full effort on the neurocognitive testing. Id. at 20. Dr. Kertay rejected Dr. Meharg's opinion that other evidence suggested that factors beyond Ramos' control prevented Ramos from fully focusing on the neurocognitive testing, and Dr. Kertay believed that it was unreasonable for Dr. Meharg to rely on the testing in support of any diagnosis of Ramos' alleged mental health problems. Id. at 20-21. Dr. Kertay also noted that Dr. Meharg's reliance on the RBANS test as a diagnostic tool was misplaced, because Dr. Kertay opined that RBANS was simply a screening test that would indicate that additional neurocognitive testing was necessary. Id. at 21. Dr. Kertay considered Ramos' results on other testing in support of his opinion that Ramos retained the ability to complete complex tasks and interpret new information, and he found that Ramos' alleged symptoms would not be caused by a hypoxic injury consistent with sleep apnea. Id. The only possible condition that Dr. Kertay found would be supported by the medical evidence was a mild case of depression, but Dr. Kertay

did not find any evidence suggesting that depression alone would cause any functional limitations that would prevent Ramos from working.  Id. at 21-22.

On October 12, 2020, Cigna issued a letter formally denying Ramos' claim for STD benefits as of August 20, 2020, and Cigna advised Ramos that he had a right to appeal the adverse decision. Dkt. # 17, at 240-42.  Ramos appealed the denial the next day and he chose not to submit any additional medical records in support of his appeal.  Id. at 244; Dkt. # 48, at 14.  Cigna provided the same medical records reviewed by Dr. Kertay to a second psychologist, Gitry Heydebrand, Ph. D., for an opinion as to Ramos' functional capacity.  Dkt. # 17, at 262-64.  Dr. Heydebrand concluded that Ramos had no psychiatric conditions that would cause any functional limitations, and she determined that Ramos' scores on the TOMM test were consistent with persons who were "deliberately  attempting to misrepresent their potential and to feign impairment."  Id. at 264.  Dr. Heydebrand also rejected Dr. Meharg's reliance on RBANS as a diagnostic tool, and she criticized Dr. Meharg's failure to obtain multiple sources of data in support of his opinions concerning Ramos' alleged limitations.  Id. at 22.  Dr. Heydebrand found no valid or reliable evidence suggesting that Ramos had any functional limitations due to a cognitive impairment.  Id.  On December 18, 2020, Cigna sent Ramos a letter denying his appeal, and Cigna advised Ramos that he could file a lawsuit asserting an ERISA claim or a second voluntary appeal if he disagreed with Cigna's decision.  Id. at 273-76.

Ramos initially sent letters to the Plan Administrator requesting Plan documents that he believed were applicable to his claim for STD benefits.  Dkt. # 17-1, at 280-82.  The Plan provided the requested documents to Ramos in February 2021, and he also received a copy of the claim file. Dkt. # 17, at 288; Dkt. # 17-1, at 206.  On June 3, 2021, Ramos filed a second voluntary appeal to

9

the Plan Administrator, and he submitted additional medical records and arguments in support of his claim for STD benefits. Dkt. # 17-1, at 289-301. In particular, Ramos complained that neither Dr. Kertay nor Dr. Heydebrand considered the actual duties of Ramos' job and, instead, they relied on general terms such as "global functional loss, loss of function, or significant functional limitations" that are not part of the definition of "disability" under the Plan. Id. at 295. Ramos provided a supplemental letter from Dr. Meharg addressing Dr. Heydebrand's rejection of his clinical findings concerning Ramos' effort when taking neurological testing, Dr. Meharg's reliance on RBANS as a means of assessing Ramos' memory capacity, and the role of sleep apnea in causing a coginitive impairment. Id. at 302-05; Dkt. # 17-2, at 1-2. Dr. Meharg argued that it was unreasonable for Dr. Heydebrand to conclude that Ramos was exaggerating the severity of his symptoms based solely on the TOMM test, and Dr. Meharg stated that it was necessary to consider the totality of the neurocognitive testing results and Dr. Meharg's personal observations of Ramos during the testing. Dkt. # 17-1, at 304-05. He recognized that RBANS is not the most comprehensive test for memory capacity, but lengthier and less humane testing would likely have shown the same results. Dkt. # 17-2, at 1. Dr. Meharg also cited studies supporting his finding that inadequately treated sleep apnea contributed to Ramos' neurological deficits. Id. at 2. Based on the documents already in the claim file and the new evidence, Ramos asked the Plan Administrator to reinstate his STD benefits as of August 20, 2020 and direct Cigna to approve a claim for LTD benefits. Dkt. # 17-1, at 300.

The Plan Administrator acknowledged receipt of Ramos' second voluntary appeal and asked him to undergo an independent medical examination (IME). Dkt. # 17-3, at 302-03. Ramos agreed to participate in an IME, and the Plan Administrator sought Cigna's assistance in setting up the IME.

Id. at 307-08.  Ramos was referred to Russell Pella, Ph. D., for an IME, and Dr. Pella concluded that the results of the examination were "within the range of invalid performance."  Dkt. # 17, at 308. Dr. Pella described Ramos as suspicious, defensive, and uncooperative during the examination, and his answers to questions were frequently of minimal value in determining his mental conditions and limitations.  Id. at 307-08.  Ramos reported that he suffered from significant memory loss and difficulty with maintaining focus on even simple tasks, and he is frequently angry and loses his temper easily. Id. at 312.  However, Dr. Pella rejected Dr. Meharg's conclusions concerning Ramos' limitations and memory problems, and he found that Ramos' lack of candor and over-reporting of symptoms resulted in entirely invalid testing that was not useful in determining if Ramos had a mental health impairment or functional limitations.  Id. at 315-16.

While the second voluntary appeal was pending, Ramos participated in a psychological evaluation as part of his claim for Social Security disability benefits.  The examiner, Eddie Scott, Ph. D., noted that Ramos was oriented to person, place, and time, but Ramos tended to ramble when speaking and frequently forgot the topic of the conversation. Dkt. # 17-4, at 10.  Ramos' mood was described as anxious and depressed and he became tearful when discussing his condition. Id. at 11. Ramos told Dr. Scott that he had previously attempted suicide and he would likely kill himself if it were not for his 11 year old daughter.  Id.  Ramos reported that he was hospitalized in March 2020 after having a panic attack, and an MRI allegedly showed that Ramos was possibly suffering from vascular dementia.  Id. at 12.  When asked about conditions that prevented him from working, Ramos identified lower back pain and bulging discs as physical impairments, but he stated that mental impairments such severe memory problems and lack of concentration made it dangerous for him to return to his previous employment. Id. at 13.  Dr. Scott performed a battery of testing known

11

as the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV), and Ramos' IQ score of 82 was in the low average range. Id. at 14. However, Ramos' working memory score was in the extremely low range, and Dr. Scott could not rule out the possibility of a learning disability or dementia as a cause of his mental limitations. Id. Dr. Scott found no evidence that Ramos was feigning or exaggerating his symptoms, and he also found that Ramos' condition was unlikely to improve over the next year. Id. at 15. Ramos provided Dr. Scott's report to the Plan Administrator while his voluntary appeal was pending. Id. at 9.

On December 3, 2021, the Plan Administrator issued its decision denying Ramos' second voluntary appeal. Id. at 19. The single-page denial letter states that the Committee reviewed the claim file, Dr. Scott's evaluation report, and the results of Dr. Pella's IME. Id. The denial letter did not explain the reasoning or rationale for the Plan Administrator's decision, and Ramos asked the Plan Administrator to provide him "all documents, records, and other information submitted, considered, or generated in the course of the Plan's and/or Cigna's review on Mr. Ramos' voluntary appeal." Id. at 26. The Plan Administrator provided some additional documents to Ramos, but Ramos' attorney subsequently clarified that he was seeking documents or communications reflecting the reasoning or rationale supporting the Plan Administrator's decision on Ramos' voluntary appeal. Dkt. # 17-5, at 1. The Plan Administrator responded that all documents responsive to Ramos' request were already in his possession, and the second voluntary appeal was not part of the Plan's obligation to provide a "full and fair review" of the initial denial of Ramos' claim for STD benefits. Id. at 28. On February 8, 2022, Ramos filed this case alleging an ERISA claim on the ground that the Plan Administrator improperly denied his claim for STD benefits. Dkt. # 2. Ramos asked the Court to order the Plan Administrator to reinstate his STD benefits and allow him to apply for and

receive any other benefits available to a disabled person as an employee of Schlumberger. Id. at 18. Ramos alternatively requested that the Court remand the case to the Plan for a full and fair review of his claim for STD benefits. Id.

The Court remanded the case for clarification of the Plan Administrator's decision to deny plaintiff's second voluntary appeal. The Plan Administrator cited authority that a second voluntary appeal was not ordinarily treated as the final decision on a benefits claim, but the Court found that the plain language of the Plan treated the Plan Administrator's decision on a second voluntary appeal as "final and binding."[2] Dkt. # 29, at 19. Plaintiff sought attorney fees following the Court's decision remanding the case for clarification. Dkt. # 31. The Court denied the motion, finding that plaintiff had not obtained some degree of success on the merits of his ERISA claim that would support an award of attorney fees. Dkt. # 38. Plaintiff filed a motion to reopen the case, even though the Plan Administrator had not issued a new decision, and he argued that the Plan Administrator violated ERISA regulations by failing to issue a new decision within 30 days of the Court's ruling. Dkt. # 37. Plaintiff also claimed that the Plan Administrator's failure to issue a timely decision constituted a serious procedural irregularity, and he asked the Court to apply a de novo standard of review after reopening the case. Id. at 3. The Plan Administrator responded that it had issued the required clarification of its previous decision, and it asked the Court to summarily the affirm the Plan Administrator's decision to deny plaintiff's claim for disability benefits. Dkt. # 37, at 7-10. The Court noted that the Plan Administrator had issued clarification of the basis for its denial of plaintiff's second voluntary appeal on February 22, 2024, and the case should be

---

[2]     The Plan has advised the Court that the language of the Plan has been amended to eliminate any right to a second voluntary appeal to the Plan Administrator. Dkt. # 32, at 10.

reopened for new briefing on the merits of plaintiff's ERISA claim.  Dkt. # 41, at 5.  However, the Court rejected plaintiff's argument that Plan Administrator's decision was untimely and found that plaintiff's counsel may have engaged in gamesmanship to obtain a more favorable standard of review.  Id.  The Court expressly denied plaintiff's request for de novo review based on the alleged untimeliness of the Plan Administrator's decision, and the Court rejected both parties' requests to rule on the merits of plaintiff's ERISA claim.  Id. at 5-6.  The parties have filed new briefing addressing the merits of the Plan Administrator's denial of plaintiff's second voluntary appeal, and plaintiff's ERISA claim is ripe for adjudication.

## II.

Plaintiff argues that serious procedural irregularities occurred throughout the review of his STD benefits claim, and he asks the Court to review his ERISA claim under a de novo standard of review.  Dkt. # 48, at 24-26.  Even if the Court disagrees that the de novo standard of review applies, plaintiff contends that the Court should reverse the Plan Administrator's decision under an arbitrary and capricious standard of review, because the Plan Administrator unreasonably rejected evidence showing that he had substantial mental impairments and was unable to work.  Id. at 29-34.  The Plan Administrator responds that the Plan gives it full discretion to determine whether a claimant is entitled to benefits, and plaintiff's ERISA claim should be reviewed under an arbitrary and capricious standard of review.  Dkt. # 49, at 12-13.  The Plan Administrator contends that plaintiff's arguments are based on unreliable evidence and self-reported symptoms of cognitive and memory impairments, and he has not shown that the Plan Administrator's decision to deny his claim was an abuse of discretion.  Id. at 22-31.

**A.**

As a preliminary matter the Court must establish the proper standard of review for plaintiff's ERISA claim. Plan beneficiaries, like plaintiff, have the right to federal court review of benefit denials and terminations under ERISA. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The default standard of review is de novo. However, when a plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under § 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard. See Firestone, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms of a plan).

The parties dispute whether the arbitrary and capricious standard applies in this case. Dkt. # 48, at 23-26; Dkt. # 49, at 12-16. The Plan expressly gives Cigna "the discretionary authority and responsibility for determining benefits under the Plan," and Cigna has the "discretionary authority to interpret the provisions of the Plan and to interpret the facts and circumstances of claims for benefits. Dkt. # 17-1, at 269-70. On a second voluntary appeal, the Plan Administrator has the "sole discretion" to determine whether a claimant is entitled to benefits. Id. at 270. However, plaintiff argues that serious procedural irregularities occurred during the review of his claim that require the Court to apply a de novo standard of review to his ERISA claim. Dkt. # 48, at 24-26. He also notes

15

that the Plan is self-funded and there is an inherent conflict of interest that should be considered as a factor in determining the standard of review.  Id. at 26-27.

Under the arbitrary and capricious standard of review, a plan administrator's or fiduciary's decision will be upheld "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).  That basis "need not be the only logical one nor even the best one." Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999)). The decision merely must "reside[] 'somewhere on a continuum of reasonableness – even if on the low end." Adamson, 455 F.3d at 1212  (quoting Kimber, 196 F.3d at 1098).  A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).  The Tenth Circuit has stated that courts reviewing a denial of benefits under the arbitrary and capricious standard should consider if the denial "(1) was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." D.K. v. United Behavioral Health, 67 F.4th 1224, 1236 (10th Cir. 2023).  "The 'consistent with the purpose of the plan' requirement means a plan administrator acts arbitrarily and capriciously if the administrator 'fail[s] to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'" Id. (quoting Tracy O. v Anthem Blue Cross Life & Health Ins., 807 F. App'x 845, 854 (10th Cir. 2020)).

"Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary." Caldwell v. Life Ins. Co. of N. Am., 287

F.3d 1276, 1282 (10th Cir. 2002).  The Tenth Circuit has held that "'[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'  Substantial evidence requires 'more than a scintilla but less than a preponderance.'"  Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted).  In reviewing the plan administrator's or fiduciary's decision, the reviewing court generally is "limited to the 'administrative record' – the materials compiled by the [decisionmaker] in the course of making [the] decision."  Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002).  The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence.  Caldwell, 287 F.3d at 1282.

If an ERISA fiduciary plays more than one role – i.e., deciding eligibility and paying benefits claims out of its own pocket – a conflict of interest arises.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008); Graham v. Hartford Life & Acc. Ins. Co., 589 F.3d 1345, 1358 (10th Cir. 2009).  In Glenn, the Supreme Court rejected any argument that this conflict of interest requires courts to shift the burden of proof to the plan administrator in cases where a conflict of interest exists.  Glenn, 554 U.S. at 117.  "Glenn embraces . . . a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'"  Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting Glenn, 554 U.S. at 118).  "A conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .'"  Id. (quoting Glenn, 554

U.S. at 117).  In this case, the parties agree that the Plan is self-funded by Schlumberger, and plaintiff acknowledges that his claim is relatively "small-dollar claim" in light of the Plan's total assets in excess of $1 billion.  Dkt. # 48, at 26.  Although the Plan contends that the conflict of interest should not given any weight in determining the standard of review, the Court cannot ignore that the Plan is self-funded and that the Plan Administrator ruled on plaintiff's second voluntary appeal.  The Court will, as suggested by plaintiff, consider the inherent conflict of interest as a factor if the Court is "waver[ing] between affirmance and reversal" if there is evidence tending to show that the conflict of interest affected the benefits decision.  Dkt. # 48, at 27 (citing Hancock v. Metropolitan Life Ins. Co., 590 F.3d 1141, 1155 (10th Cir. 2009)).

The Court has determined that the Plan Administrator's denial of plaintiff's second voluntary appeal is the final decision that is subject to judicial review.[3]  Plaintiff argues that the Plan Administrator's decision should be reviewed under a de novo standard of review due to numerous procedural irregularities that occurred during the review of plaintiff's claim.  Plaintiff argues that Plan Administrator violated ERISA regulations by issuing its Court-order clarification more than 30 days after the Court entered its remand order.  Dkt. # 48, at 25.  The Plan Administrator allegedly failed to provide Dr. Pella all of plaintiff's medical records for the IME, and the Plan Administrator gave substantial weight to Dr. Pella's findings in its decision denying plaintiff's claim for disability

---

[3]     Plaintiff argues that the Plan Administrator's initial failure to provide an adequate explanation for denying his second voluntary appeal is a serious procedural irregularity. Dkt. # 48, at 24.  The Court remanded plaintiff's ERISA claim to cure this procedural error, and the Court declines to consider this issue as a procedural irregularity for determining the standard review.   Plaintiff could also be challenging the sufficiency of the Plan Administrator's explanation that was provided after the case was remanded, but plaintiff does not rely on this argument to establish a procedural irregularity that would affect the standard of review.  Id. at 33.

benefits.  Id.  The Plan Administrator also sought assistance from CIGNA in setting up the IME after plaintiff filed a second voluntary appeal, and plaintiff claims that CIGNA was permitted to "dictate[] the focus of the IME."  Id. at 26.

In some cases, courts have reduced the level of deference shown to a plan administrator's decision if there was a serious procedural irregularity that occurred during the review of the plaintiff's claim.  LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan, 605 F.3d 789, 797-98 (10th Cir. 2010); Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 631 (10th Cir. 2003).  As noted by the Tenth Circuit, cases in which courts have applied a de novo standard of review generally concern situations where the plan administrator has wholly failed to issue a decision or has done so only after a lengthy delay.  Messick v. McKesson Corp., 640 F. App'x 796, 798 (10th Cir. Feb. 17, 2016);[4] Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1317-18 (10th Cir. 2009).  The alleged procedural irregularities in this case are not of the same type or severity that would warrant de novo review of plaintiff's ERISA claim. Plaintiff argues that Dr. Pella was not given all relevant medical evidence and that the Plan Administrator should not have given his findings substantial weight when making its decision.  The Court will consider this argument in the context of plaintiff's ERISA claim, but this argument is more substantive than procedural and has no bearing on the standard of review.  Plaintiff makes a related argument that the Plan Administrator should not have sought Cigna's assistance in scheduling the IME.  The Plan Administrator could reasonably rely on Cigna's claim handling expertise without involving Cigna in the final decision on plaintiff's second voluntary appeal, and

---

[4]    Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

this does not constitute a serious procedural irregularity.  The Court also notes that plaintiff's argument concerning the alleged untimeliness of the Plan Administrator's post-remand clarification were considered and rejected when the Court considered plaintiff's request to reopen his ERISA claim.  Dkt. # 41.

The Plan clearly gives the Plan Administrator discretionary authority to interpret the Plan and make benefits determinations when ruling on a second voluntary appeal, and plaintiff's ERISA claim must be reviewed under an arbitrary and capricious standard of review.  Plaintiff has not shown that a serious procedural irregularity occurred that rendered the proceedings before the Plan Administrator unfair or unreliable.  The alleged procedural errors identified by plaintiff have been considered and rejected in previous rulings by the Court or are substantive in nature, and the Court finds no reason to vary from the standard of review typically applicable to ERISA claims when the decision maker has the discretionary authority to make benefits determinations.  See Ian C. v. UnitedHealthcare Insurance Company, 87 F.4th 1207, 1218 (10th Cir. 2023) (declining to "stir the pot" and reaffirming that Supreme Court precedent dictates a discretionary standard of review for ERISA claims).

**B.**

Plaintiff argues that he produced a substantial amount of medical evidence that supported his self-reported symptoms of depression and memory loss, and the opinions of his treating physicians that he was unable to work were well-supported by the record.  Dkt. # 48, at 27-29. Plaintiff asks the Court to reject the Plan Administrator's finding that plaintiff's conditions "had been, or were being, treated without complication or could not be substantiated based on the records and information submitted," because the Plan Administrator failed to offer analysis of the medical

evidence its support of its conclusions. Id. at 30. The Plan responds that plaintiff failed to meet his burden to prove that he was "disabled" as that term is defined by the Plan, and the Plan Administrator did not abuse its discretion when it concluded that plaintiff was not entitled to STD benefits. Dkt. # 49, at 22-27. The Plan argues that it was not required to defer to Dr. Meharg's findings that plaintiff had functional limitations that prevented him from working, and the physicians reviewing plaintiff's file reasonably concluded that plaintiff's poor results on neurocognitive testing was the result of feigning an impairment or lack of effort on the tests. Id. at 28-31.

The Plan's final decision on plaintiff's claim for STD benefits is the February 22, 2024 decision on plaintiff's second voluntary appeal following the Court's decision remanding the case for further proceedings. Dkt. # 45-1. The Plan denied plaintiff's claim for STD benefits on the grounds that the medical evidence did not support his subjective claims of mental impairment or his conditions were being successfully controlled with medical treatment. Id. at 2. The Plan considered the findings from the psychological examinations conduct by Dr. Meharg and Dr. Scott and concluded that their findings did not tie any limitations to "specific clinical findings" and "overall are not well supported." Id. The Plan also determined that the findings of Dr. Meharg and Dr. Scott conflicted with other evidence in the administrative record, including with the findings of other physicians who had personally examined plaintiff. Id. However, the denial letter does not provide a more detailed analysis of Dr. Meharg's or Dr. Scott's findings, and the letter does not specifically identify any deficiencies in their testing or methodology.[5]

---

[5]    Plaintiff acknowledges that the denial letter references Dr. Scott's October 2021 evaluation of plaintiff, but he has chosen not to assert any arguments related to the Plan Administrator's treatment of Dr. Scott's findings. Dkt. # 48, at 30. Plaintiff believes that Dr. Scott's examination does not tend to show whether plaintiff was disabled as of August/September 2021, and the Court will not consider the Plan Administrator's treatment of Dr. Scott's

**Dr. Meharg**

Plaintiff relies heavily on Dr. Meharg's findings that plaintiff suffered from a neurocognitive disorder and major depressive disorder that caused him to have severe functional limitations that prevented him from working in support of his ERISA claim. Dkt. # 17, at 201-02; Dkt # 48, at 31-32. The Plan Administrator did not find Dr. Meharg's assessment of plaintiff's condition persuasive based upon file reviews conducted by Dr. Kertay and Dr. Heydebrand, because plaintiff's test results strongly suggested that he gave inconsistent or minimal effort that invalidated the test results. Dkt. # 17, at 263-64; Dkt. # 17-5, at 20-22. As part of plaintiff's voluntary second appeal, plaintiff submitted a rebuttal letter from Dr. Meharg explaining that he took into account test results suggesting that plaintiff did not provide sufficient effort when taking the previous neurocognitive examination, and he acknowledged that plaintiff failed the TOMM examination relating to the subject's lack of effort. Dkt. # 17-1, at 304. However, Dr. Meharg believed that plaintiff's TOMM score was an "outlier" due other test results showing that plaintiff was giving adequate effort during neurocognitive testing. Id. at 304-05. Dr. Meharg explained that the overall test results and his personal observations of plaintiff during the examination led him to believe that there were more likely explanations for plaintiff's TOMM score other than feigning. Id. The Plan Administator did not specifically reference Dr. Meharg's rebuttal letter in its denial of plaintiff's second voluntary appeal, and there were no additional findings on plaintiff's perceived lack of effort during his psychological examination with Dr. Meharg.

The Plan Administrator argues that Dr. Meharg's findings were discredited by physicians who reviewed plaintiff's file, and it was reasonable for the Plan Administrator to give little or no

findings in this Opinion and Order.

weight to Dr. Meharg's findings that plaintiff was suffering from a substantial neurocognitive disorder.  Dkt. # 49, at 29-30.  Dr. Kertay determined that Dr. Meharg's findings were invalid due to plaintiff's lack of effort during the neurocognitive testing, and none of the test results should have been interpreted to support the existence of an impairment.  Dkt. # 17-5, at 21.  Dr. Kertay acknowledged that low scores on certain tests did not automatically mean that plaintiff was feigning an impairment or intentionally underperforming, but Dr. Kertay found that plaintiff's higher scores on more complex tests were not consistent with severe memory or learning impairments.  Id.  Dr. Kertay criticized Dr. Meharg's decision to build a testing battery around the RBANS, which was simply a screening measure used to determine if additional testing for neurocognitive impairments was warranted.  Id.  As part of plaintiff's mandatory appeal to Cigna, Dr. Heydebrand reviewed Dr. Meharg's initial report and determined that plaintiff's results were invalid due to his lack of effort. Dkt. # 17, at 263-64.  Dr. Heydebrand also criticized Dr. Meharg's reliance on RBANS as a diagnostic test, and she rejected Dr. Meharg's conclusions concerning the severity and duration of plaintiff's limitations.  Id. at 264.

The Court finds that the Plan Administrator's treatment of Dr. Meharg's initial report and rebuttal letter was reasonable, and the Plan Administrator did not have to afford significant weight to Dr. Meharg's findings that plaintiff was suffering from a mental or cognitive impairment that caused functional limitations.  Both Dr. Kertay and Dr. Heydebrand concluded that plaintiff's test results were invalid due to his lack of effort, which is consistent with Dr. Meharg's own findings that plaintiff's scores on the TOMM could be indicative of "incomplete effort."  Dkt. # 17, at 196. Dr. Meharg chose to interpret the test scores as evidence that plaintiff was suffering from a significant memory impairment, and he used the total test results, rather than just the TOMM scores,

to support his opinion that the test results were valid and reliable. Id. That does not mean that Dr. Kertay or Dr. Heydebrand were compelled to reach the same conclusion, and they asserted reasonable objections to the validity of Dr. Meharg's methodology and conclusions. Dr. Meharg's rebuttal letter specifically acknowledges that Dr. Heydebrand correctly characterized plaintiff's scores on the TOMM as failing scores and that plaintiff's TOMM scores reasonably raised concerns that he was not giving adequate effort. Dkt. # 17-1, at 304. Dr. Meharg explained that he "elected not to consider feigning-based invalidity as a major cause of [plaintiff's] poor performance" based on the combined test scores and his own observations of plaintiff during the testing. Id. at 305. Dr. Meharg's rebuttal letter provides additional clarification of his opinions, but the rebuttal letter does not tend to show that Dr. Kertay's or Dr. Heydebrand's interpretation of plaintiff's test results was unreasonable.

Plaintiff could be arguing that Dr. Meharg personally examined plaintiff, and his findings should be given greater weight than the opinions of physicians who merely reviewed plaintiff's file. Dkt. # 48, at 33. A plan administrator may "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician . . . [but] courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician . . . ." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); see also Shaw v. AT&T Umbrella Benefits Plan No. 1, 795 F.3d 538 (6th Cir. 2015) (explaining that treating physician opinions are not entitled to special deference, but such evidence may not be ignored or disregarded when making a benefits determination); Love v. Dell, Inc., 551 F.3d 333 (5th Cir. 2008) ("ERISA does not require the opinions of treating physicians to be preferred over those of other physicians reviewing a file; ERISA merely requires that the opinions of treating physicians, as with all evidence

24

submitted by the claimant, actually be taken into account in an administrator's determination"). The Plan Administrator considered Dr. Meharg's findings concerning plaintiff's mental impairments and limitations, but determined that Dr. Meharg's findings were unreliable and not well supported. Dkt. # 45-1, at 2. The Court has already determined that Dr. Kertay and Dr. Heydebrand offered reasonable criticisms of Dr. Meharg's conclusions, and plaintiff's complaints concerning the weight or treatment given to Dr. Meharg's opinions does not provide a basis for the Court to set aside the Plan Administrator's denial of benefits as arbitrary or capricious.

**Dr. Pella's IME**

Plaintiff argues that the Plan Administrator should not have relied on the results of the IME as a basis to deny his STD benefits claim, because the Plan Administrator failed to supply all of plaintiff's medical records, specifically Dr. Meharg's rebuttal letter, to Dr. Pella before he conducted the IME. Dkt. # 48, at 25, 32-33. Plaintiff also contends that the Plan Administrator allowed Cigna to "dictate the focus" of the IME, even though Cigna handled and rejected the initial appeal, and this created an appearance that Cigna had a substantial role in the Plan Administrator's decision to deny plaintiff's second voluntary appeal. Id. at 25-26. The Plan Administrator responds that Dr. Pella's findings were primarily based on his own testing of plaintiff, rather than plaintiff's pre-existing medical records, and Dr. Meharg's rebuttal letter had no relevance to Dr. Pella's IME. Dkt. # 49, at 15. As to the second part of plaintiff's argument, the Plan Administrator appears to be arguing that plaintiff was not entitled to a "full and fair" review on a second voluntary appeal, and the alleged appearance of bias or unfairness from Cigna's involvement in setting up the IME has no bearing on the Court's review of the Plan Administrator's decision. Id. at 15-16.

The Court finds that any procedural errors by the Plan Administrator in failing to provide Dr. Pella with a copy of Dr. Meharg's rebuttal letter or in allowing Cigna to organize the IME were effectively harmless and had no bearing on the results of the IME. Dr. Meharg's rebuttal letter primarily provided clarification for his selected methodology and his reasons for discounting plaintiff's lack of effort as a reason to question the validity of plaintiff's neurocognitive testing. Dkt. # 17-1, at 303-05; Dkt. # 17-2, at 1-2. Dr. Pella conducted a thorough battery of testing and formed his own opinions about plaintiff's effort during those tests, and Dr. Meharg's explanation of his prior testing had little relevance to Dr. Pella's examination. Even if Dr. Pella had been able to review Dr. Meharg's rebuttal letter, Dr. Pella's examination report provides extensive details about his difficulties in conducting the IME due to plaintiff's uncooperative behavior during the IME. Dkt. # 17-3, at 318 ("While rapport was established, it was tenuously maintained due to suspiciousness, defensiveness, and uncooperativeness at times); id. (Dr. Pella noted plaintiff's "terse conclusory phrases that effectively discontinued a productive thread of interviewing" and made it difficult to obtain reliable information from plaintiff); Dkt. # 17-4, at 3 ("In terms of the current evaluation, consistent data from the cognitive and self-report measures were invalid due to issues with the examinee over-reporting symptoms and not putting forth the quality of effort that is needed to yield consistent, valid, and otherwise neuromedically meaningful information"). Dr. Pella reviewed and summarized Dr. Meharg's initial report, and Dr. Pella rejected Dr. Meharg's explanation for the apparent facial invalidity of the test results. Dkt. # 17-4, at 1. Plaintiff accurately notes that Dr. Pella did not have a copy of Dr. Meharg's rebuttal letter, but he fails to offer any argument suggesting that the rebuttal letter would have impacted Dr. Pella's findings.

26

As to Cigna's involvement in setting up the IME, plaintiff has made no attempt to show that Cigna participated in the IME or directed the outcome of the IME, and his primary complaint is that the referral to Dr. Pella suggested that he should conduct a "present time" evaluation of plaintiff. Dkt. # 48, at 19, 25-26. Plaintiff believes that Dr. Pella should have attempted to establish whether plaintiff had any functional limitations caused by a mental impairment in August and September 2020, rather than at the time the IME took place. Id. Even assuming that plaintiff is correct about the focus of the IME, plaintiff has provided no basis for the Court to conclude that he would have been more cooperative during the examination and that the results would have been valid. Plaintiff has also cited no evidence that Cigna's role in setting up the IME had any effect on Dr. Pella's examination of plaintiff. Even if there was an appearance of unfairness in allowing Cigna to set up the IME, plaintiff has failed to show that the appearance of unfairness resulted in any bias on the part of Dr. Pella when he performed the IME or that the outcome of the IME would have been different had the Plan Administrator directly set up the IME.

**Jensen and Dr. Lupu**

Plaintiff argues that the Plan Administrator improperly disregarded the medical findings of Jensen and Dr. Lupu merely as plaintiff's self-reporting of his own symptoms, and there is a significant amount of evidence that plaintiff had functional limitations that prevented him from working. Dkt. # 50, at 5-7. Defendant responds that the opinions provided by Jensen and Dr. Lupu concerning plaintiff's ability to work and his functional limitations are not based on clinical findings or testing, and their opinions do little more than record plaintiff's self-reported symptoms of reduced cognitive abilities. Dkt. # 49, at 22.

27

Plaintiff cites to Jensen's finding in April 2020 that plaintiff should abstain from work until cleared by a neurologist. Dkt. # 17, at 96. However, there is no examination report, specific findings, or even an explanation other than "[b]rain function/memory function" for Jensen's recommendation that plaintiff was unable to work. Id. Dr. Lupu, a neurologist, conducted a virtual examination of plaintiff on May 5, 2020, and he provided the following assessment of plaintiff's conditions:

1.      Forgetfulness
2.      White matter abnormality on MRI of brain
3.      Sleep apnea
4.      Vitamin D deficiency
5.      Severe episode of recurrent depressive disorder, without psychotic features (HCC)
6.      Alcohol use disorder, severe, in controlled environment (HCC)
7.      Hearing loss

Id. at 104. Dr. Lupu noted that he did not have the MRI films, but plaintiff believes that Dr. Lupu must have been able to review the "result narrative" from the MRI to make findings that plaintiff had "several high signal foci in the periventricular white matter on T2 and FLAIR in the bilateral frontal lobes and right parietal lobe." Id. at 107. Dr. Lupu also noted that plaintiff "was told he has white matter abnormalities and mild brain shrinking," but Dr. Lupu does not state that he reviewed any of plaintiff's medical records when making a finding concerning a white matter abnormality. Id. at 105. Dr. Lupu made a referral for neuropsychological testing, but he did not conduct any such testing during his virtual examination of plaintiff. Id. at 108.

In September 2020, Cigna notified plaintiff that it had not received updated medical records in support of his disability benefits claim, and plaintiff returned to Jensen to obtain additional

28

information in support of his claim.  Jensen stated that plaintiff had a "cognitive and memory impairment of unknown etiology" and referred plaintiff for a neurological examination. Id. at 191. On September 25, 2020, plaintiff had a follow-up visit with Dr. Lupu, and Dr. Lupu had not received the MRI films. Id. at 225-26.  However, he clearly stated that he had reviewed the MRI report and he noted the findings of "nonspecific white matter changes and mild cortical atrophy." Id. at 226. Dr. Lupa reviewed Dr. Meharg's findings with plaintiff, and advised plaintiff of Dr. Meharg's diagnosis of mild neurocognitive disorder due to multiple etiologies, including sleep apnea and major depressive disorder." Id.  Plaintiff reported that he was "not able to work because he forgets how to operate safety protocols" and he was afraid he would cause an injury to himself or others. Id.  Dr. Lupu did not make any specific findings about plaintiff's functional limitations and he did not make any recommendations about plaintiff's ability to work, although he did order a brain PET scan to evaluate plaintiff's risk for early onset dementia. Id. at 228.

Although plaintiff provided medical records to the Plan Administrator in support of his benefits claim, the Court finds that the Plan Administrator's determination that the evidence did support the existence of any functional limitations caused by a mental impairment is supported by substantial evidence. Jensen's reports concerning plaintiff's mental limitations are largely based on plaintiff's self-reported symptoms, and it does not appear that Jensen independently performed any neurocognitive testing or analysis that would support her recommendation that plaintiff was unable to work.  Dr. Lupu's examinations of plaintiff's conditions were more thorough and he examined multiple aspects of plaintiff's health, but Dr. Lupu did not make any clinical findings that could be viewed as functional limitations that impacted plaintiff's ability to perform the functions of his job. Dr. Lupu did review Dr. Meharg's initial report with plaintiff and he noted Dr. Meharg's findings

of mild neurocognitive disorder accompanied by poor working memory. Dr. Lupu's review of Dr. Meharg's findings with plaintiff does not somehow make the findings more reliable or cure the deficiencies noted by Dr. Kertay and Dr. Heydebrand. If Dr. Meharg's findings had been more reliable, Jensen's and Dr. Lupu's evaluations of plaintiff could reasonably have supplemented Dr. Meharg's examination results. However, the Plan Administrator reasonably concluded that the medical evidence provided by plaintiff did not support the severity of the conditions reported by plaintiff.

**Objective Medical Evidence**

The parties dispute whether the Plan permitted the decision maker to require plaintiff to provide "objective medical evidence" or whether the absence of "objective medical evidence" was a relevant factor in the decision to deny plaintiff's benefits claim. Plaintiff argues that the Plan does not have a "proof of loss" provision or specifically require a claimant to produce objective medical evidence, and plaintiff contends that is unreasonable for the Plan Administrator to deny his claim based on a lack of objective medical evidence. Dkt. # 48, at 8; Dkt. # 50, at 1. The Plan Administrator responds that the "lack of objective medical evidence necessarily informs whether a claimant has carried his burden to show that he is disabled within the meaning of the Plan." Dkt. # 49, at 10. Plaintiff is correct that the Plan does not contain an express provision requiring a claimant to provide "objective medical evidence" in support of a benefits claim. However, the Plan Administrator did not deny plaintiff's second voluntary appeal due to a lack of "objective medical evidence." Plaintiff's benefits claim was primarily denied based on the Plan Administrator's finding that plaintiff heavily relied on self-reported symptoms of mental limitations, and the medical evidence he provided in support of his claim was invalid due to the unreliability of the

neurocognitive testing.  Dkt. # 45-1, at 1-2.  This is not, as plaintiff suggests, imposing an additional requirement to provide objective medical evidence, and the parties' dispute over the consideration of "objective medical evidence" has no bearing on the outcome of plaintiff's ERISA claim.

## C.

The Court has fully reviewed the parties' arguments and the evidence in the administrative record, and finds that plaintiff has not shown that the Plan Administrator's decision to deny plaintiff's claim for STD benefits was arbitrary and capricious.  The Plan Administrator acted within its discretion to reject Dr. Meharg's findings of plaintiff's mental impairments, and Plan Administrator reasonably concluded that the remaining medical evidence did not independently establish that plaintiff was disabled under the terms of the Plan.

**IT IS THEREFORE ORDERED** that defendant's decision to terminate plaintiff's short term disability benefits is **affirmed**.  A separate judgment is entered herewith.

**DATED** this 25th day of July, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

31